The father appeals from a Juvenile Court decree terminating his parental rights under G. L. c. 119, § 26, placing the child in the care of the Department of Children and Families (department), and approving the department's adoption plan.[3] He argues that the department failed to use reasonable efforts to reunify him and the child, that the judge's finding of parental unfitness was clearly erroneous, and that the judge took an overly active role in the proceedings, thereby denying the father a fair trial. We affirm.
Background. On April 5, 2013, the department responded to a report filed by a hospital worker, pursuant to G. L. c. 119, § 51A, alleging neglect of newborn Leroy by both the mother and father. The mother had a significant substance abuse history, but the mother and father would not allow Leroy to undergo toxicology testing, and they sought to leave the hospital with Leroy against medical advice. The department's subsequent investigative report under G. L. c. 119, § 51B, found that Leroy had tested positive for cocaine and oxycodone, was showing signs of withdrawal, and was being administered morphine by medical personnel, and that the mother's other medical history placed Leroy "at significant risk of further neglect if he failed to receive medical care in a timely manner."
The department assumed emergency custody of Leroy and on April 8, 2013, filed a care and protection petition pursuant to G. L. c. 119, § 23(a )(3), following which the department was granted temporary custody. Upon his release from the hospital, Leroy was placed with a foster family, who later became the preadoptive family. By May 9, 2013, the department had developed service plans for each parent, with a goal of family reunification. The father's service plan contained seventeen tasks with a stated "outcome" of "recovery from alcohol/drug abuse/misuse" in order to "ensure that children [sic ] are not exposed to individuals under the influence of drugs."
The judge found that the father "has not engaged in consistent services" offered by the department. In February, 2014, a department psychologist evaluated the father; based on that evaluation, the judge found the father "suffers from Personality Disorder with Narcissistic Features. His problems are not quickly or easily changed. The first step toward such change is admitting to having problems and Father appeared, at that time ... to be nowhere near taking even that first step." These problems included the father's continuing alcohol and substance abuse, mental health issues for which the father refused to engage in consistent treatment, and domestic violence against the mother.
On February 12, 2014, the department held a permanency planning conference and changed the goal for Leroy to adoption. After a trial in December, 2015, and January, 2016, the judge found Leroy in need of care and protection and terminated the parental rights of the father. The father appealed.
Discussion. 1. Reasonable efforts. The father argues that the department violated, in three respects, the requirement that, "[b]efore seeking to terminate parental rights, [it] must make 'reasonable efforts' aimed at restoring the child to the care of the natural parents." Adoption of Ilona, 459 Mass. 53, 60 (2011) (quotation omitted). See G. L. c. 119, § 1. We disagree.
First, the father claims that the department failed to offer him services until his paternity of Leroy was confirmed. He cites no evidence to support this claim. To the contrary, the record shows that the department had a seventeen-part service plan in place for the father within one month after Leroy's birth; supervised visitation occurred, with the department providing support to both parents during the visits, even before paternity was established.
Second, we do not agree that the department's immediate placement of Leroy into a "preadoptive" home indicates a lack of reasonable efforts. The department's goal at that time was family reunification. It was changed to adoption only after nine months had elapsed and a foster care review had concluded, among other things, that the father "had not followed through with recommended evaluations and classes" and "continues to ... minimize [the mother's] substance abuse history."[4] Moreover, judges (other than the trial judge) determined that the department had made reasonable efforts before first taking custody of Leroy, and before changing its permanency plan from reunification to adoption. The father did not object to such determinations at the time, as he could have. See Care & Protection of Walt, 478 Mass. 212, 218 (2017).
Third, we reject the father's argument that the department failed to make reasonable efforts to investigate his brother in New York as a possible foster parent. The brother was not identified as such until December, 2014, nine months after the goal for Leroy had been changed to adoption. The department nevertheless took steps to consider the brother, but soon encountered problems. Leroy could not go to New York without first establishing eligibility for health insurance there, and the father had not provided sufficient financial information to establish that eligibility. Although we agree with the father that there was conflicting testimony from various department social workers regarding exactly how much information the father had provided, the father himself testified that "[t]he problem with that going through was [the department] didn't have an updated financial form ... from me." We therefore see no clear error in the judge's findings (413 and 414) that the father's failure to provide the necessary information essentially precluded further consideration of the father's brother as a potential placement.[5] Compare Adoption of Daisy, 77 Mass. App. Ct. 768, 782 (2010), S.C., 460 Mass. 72 (2011) (department's reasonable-efforts obligation is contingent upon parent's obligation to fulfill various parental responsibilities).
Finally, even if (unlike here) the department had failed to make reasonable efforts, that would "not preclude the court from making any appropriate order conducive to the child's best interest." Adoption of Ilona, 459 Mass. at 61, quoting from G. L. c. 119, § 29C. See Care & Protection of Walt, 478 Mass. at 228.
2. Fitness. It was the department's burden to prove by clear and convincing evidence that the father was currently unfit to parent and that Leroy's best interests would be served by dispensing with the father's consent to adoption. See Adoption of Gregory, 434 Mass. 117, 125-126 (2001). The father challenges numerous findings of fact and several of the judge's conclusions as to fitness. After carefully reviewing these challenges, we see no basis to disturb the decision.
a. Findings of fact. The judge made extensive and detailed subsidiary findings, based on a preponderance of the evidence, which we review for clear error. Adoption of Helen, 429 Mass. 856, 859 (1999). "It [was] within the judge's discretion to evaluate the credibility of witnesses and to make his findings of fact accordingly.... He was not obligated to believe the [father's] testimony or that of any other witness." Care & Protection of Three Minors, 392 Mass. 704, 711 (1984). A number of the father's challenges target findings that depend on credibility determinations, particularly as to his denial of his alcohol and substance abuse problem or other parenting deficiencies.[6] We cannot say that any of those findings are clearly erroneous.
In other instances, the father simply mischaracterizes the findings. These include findings concerning: Leroy's addiction to drugs at birth,[7] the father's operation of a "shelter" in a separate location that nevertheless brought people and incidents into the home where the father proposed to live with Leroy,[8] the father's cocaine use[9] and criminal history,[10] Leroy's expressions of feelings toward the father and the preadoptive mother,[11] and the father's diagnosis of a personality disorder that included narcissistic features.[12]
Finally, while not challenging the substance of finding 194 that he had missed twenty percent of his supervised visits, the father challenges the judge's conclusion that this failure to visit was "willful." The father ignores the judge's separate finding 184, stating that "on four occasions, [the mother] called to cancel her visit ... and then [five] minutes later, Father would call to cancel his visit[,] offering a different excuse." The judge could permissibly characterize the failure to attend scheduled visits as wilful.[13]
b. Conclusions of law. The judge determined the father to be unfit based on the factors set forth in G. L. c. 210, § 3(c )(ii), (iii), (v), (vi), (vii), (viii), (x), and (xii). Of these eight, the father challenges only four. We consider the challenges and find them unpersuasive.
i. Factor (iii).[14] The judge concluded that this factor applied because the father had "cancelled multiple visits with the child" and had not "actively or consistently engaged in services recommended or provided by the [d]epartment intended to remedy [his] parenting deficiencies." The father's argument on this factor is limited to the claim that it cannot apply because he attended eighty percent of scheduled visits and there was testimony from one social worker that visits typically went "very well."[15]
The finding of a wilful failure to visit has already been discussed supra. As to the quality of the visits, the judge made unchallenged findings that the father sometimes became angry during visits and glared at Leroy when they ended, that he had arrived at one visit smelling of alcohol, that visits generated anxiety for Leroy, that Leroy acted out destructively after visits and required hours of one-on-one time with the preadoptive mother before calming down, and that yet, the father denied any changes in Leroy's behavior at visits. The judge took all this as evidence of the lack of a bond between the father and Leroy, the father's lack of insight into Leroy's needs, the father's anger management problem, and his poor parenting abilities. We see no error in the conclusion that factor (iii) weighed in favor of termination.
ii. Factor (v).[16] The judge concluded that this factor applied because Leroy had been in the department's custody since birth and the father had "been consistently offered services to remedy [his] parenting deficiencies and [has] refused to meaningfully engage with any of those services throughout the pendency of this case." Although the father points out that he had complied with some of the more routine tasks on his service plan,[17] a department social worker testified that he had not complied (or not consistently complied) with many of the tasks, including obtaining substance abuse counseling, refraining from associating with substance abusers, refraining from using illegal substances, maintaining a safe and substance-free home, and engaging in individual counseling. The judge found that the father had failed to complete these tasks.
Of particular concern were the father's failure to acknowledge his substance abuse, anger management, and narcissistic behavior problems, failure to consistently engage in counseling to deal with those problems, failure to stop his own substance and alcohol abuse, failure to maintain his home free of illegal substances and substance abusers, and inability to place Leroy's needs and best interests ahead of his own. Although the judge overstated matters in concluding that the father had failed to meaningfully engage with "any" of the services offered or recommended by the department, there was ample support for his conclusion insofar as it related to those services most important to remedying the father's parenting deficiencies. In short, there was no error in his conclusion that factor (v) weighed in favor of termination.
iv. Factor (vii).[18] The judge concluded that this factor applied because Leroy had been in the preadoptive home since shortly after his birth; was "significantly bonded to both [preadoptive parents and] to his foster siblings"; and "[h]is forced removal from [the preadoptive] home would likely cause him substantial psychological harm." The father challenges this conclusion by pointing to a bonding expert's testimony that Leroy "possibly" could cope with a move to, and form a bond with, the father, and that the father "possibly" could learn the parenting skills necessary to deal with the attachment disorder Leroy was at risk of developing were he to be removed from the preadoptive home. The problem with the father's argument is that the judge made numerous findings, unchallenged by the father, about the high risk of psychological harm to Leroy and the unlikelihood of his forming a secure bond with a father so deficient in the necessary parenting skills. The judge did not err in concluding that factor (vii) weighed in favor of termination.
iv. Factor (x).[19] The judge concluded that this factor applied because the father had "cancelled visits with the child for insufficient reason." We have already rejected, supra, the father's challenge to the factual finding of a wilful failure to visit, and thus we see no error in the judge's conclusion regarding factor (x).
3. Denial of fair trial. The father asserts that the judge took an overly active role in the proceedings, asking numerous and assertedly result-oriented questions of various witnesses, thereby denying the father a fair trial. Although we reject this claim, the extent of the judge's participation still warrants comment.
No doubt a judge may ask questions of witnesses.[20] Here the judge informed all counsel at the start of the trial that he expected to engage in such questioning; that he did not intend to interfere with counsel's opportunity to present their own cases; that if they found any of his questioning objectionable, they should object; and that there would be no consequences for doing so. Such a statement, while helpful, still leaves counsel in a difficult position. It is not a substitute for exercising restraint and sensitivity in asking witnesses questions only when necessary to clarify the judge's understanding of the evidence. Here, at times, the judge's interventions may have been more overbearing than necessary.[21]
Overall, however, the father conceded at oral argument that the judge did not prevent him from presenting any evidence. The father's claim that the judge improperly elicited child hearsay fails, because the testimony in question was not hearsay. See note 10, supra. The father's claim that the judge sought to develop evidence of unfitness also misses the mark.[22] So does his claim that the judge sought to "refute" testimony elicited by the father's counsel about the risk of Leroy developing an attachment disorder if removed from the preadoptive home.[23] We need not discuss here each and every additional challenge the father raises to the judge's questions. We have reviewed them all and are satisfied that the questioning did not deprive the father of a fair trial.
Conclusion. The judge did not err in concluding, after a fair trial, that clear and convincing evidence established the father's unfitness and that Leroy's best interests would be served by dispensing with the need for the father's consent to Leroy's adoption.
Decree affirmed.

The judge also terminated the mother's parental rights; she did not appeal.

"There is no specified period of time the department must afford a parent to comply with a service plan before changing the goal to adoption." Adoption of Elena, 446 Mass. 24, 32 n.5 (2006).

Although the brother had told the department he would be moving to Massachusetts, which would have eliminated the health insurance issue as a barrier to his role as a potential placement for Leroy, the department never heard further from the brother about this plan, and at the time of trial the department believed he was still in New York. The father then testified that the brother had actually moved to Massachusetts about two months before trial. The judge made no finding on whether it was the department's responsibility to track the brother's whereabouts or, conversely, the brother's (or the father's) responsibility to inform the department once the brother had moved to Massachusetts.

These include findings 48 (the father's childhood, including exposure to substance abuse); findings 115 and 197 (the father's denial of his domestic violence and substance abuse problems); findings 81 and 82 (the father's denial of any past history with the department; although a prior complaint of abuse against the father was found false, the father's denial of any knowledge of it was not credible). Also, findings 411 and 412, stating that the father lacks insight into the risk of serious adverse effects of breaking Leroy's bond with the preadoptive parents, and into what would be required of the father to deal with such effects, accurately characterize the father's testimony. Those findings reflect that the judge chose to credit instead the testimony of social worker Noel, Dr. Fornberg, and Dr. Kline in findings 387 through 410.

Contrary to the father's argument, findings 124 and 199 do not unfairly fault him for initially denying that Leroy was born addicted. Relatedly, finding 118, dealing with events at the hospital after Leroy's birth, is not, as the father claims, "partially erroneous by omission" in its failure to mention the father's version of a conversation with a physician. Even if the judge credited the father, which he repeatedly declined to do, finding 118 correctly states that the hospital would not allow the father and mother to leave with Leroy, and the father does not contend otherwise.

Contrary to the father's argument, finding 205 does not state that the father allowed prostitutes to stay at his home, merely that he allowed substance abusers and prostitutes into his home, and that there were related police responses to the home. The father does not question the accuracy of these findings or their relevance to the suitability of the home as a place for Leroy to live. Essentially the same is true of findings 227 and 229. We also find no merit in the father's challenge to finding 235, regarding the unsuitability of the shelter as a place for Leroy to live. That the father never proposed the shelter as a home for Leroy neither makes the finding clearly erroneous nor detracts from its relevance as a part of the judge's appropriately comprehensive consideration of the father's current circumstances.

Findings 66 and 306 do not state that the father intentionally smoked marijuana laced with cocaine. Rather, the father admitted that he smoked marijuana, initially denied having previously attributed a positive cocaine screen to unwittingly smoking cocaine-laced marijuana, and then later admitted having offered that explanation for the positive screen. Finding 306 permissibly finds his initial denial false. Notably, the father does not challenge finding 309, which states that his claim to have unwittingly ingested the cocaine was not only false but representative of his pattern of denying his substance abuse problem.

Finding 67, stating that the father has a criminal history, is supported by the father's CARI record extending back to 1997. The judge nowhere suggests that the father had been convicted of a crime, as the father intimates.

Contrary to the father's argument, findings 355 and 384 do not accept the preadoptive mother's recounting of certain statements by Leroy for their truth (nor did the father object on hearsay or other grounds at trial). Rather, those findings concern Leroy's state of mind: specifically, his anxiety about visits with the father, and his closeness with the preadoptive mother. See Mass. G. Evid. § 803(3)(B)(i) (2017). Nor is finding 384 erroneous by reason of failing to note that the preadoptive mother had asked Leroy to call her "mommy." The transcript and findings demonstrate that the judge was alert to issues of "coaching," and there was ample other evidence of Leroy's bond with the preadoptive mother, as shown by unchallenged findings 387, 388, and 392.

Finding 408, crediting Dr. Kline's diagnosis of the father, is not erroneous by reason of Dr. Kline's having referred in her report to the father's "reported history." Contrary to the father's claim, nothing in the report even hints that Dr. Kline was referring to the father's past history with the department, discussed in findings 81 and 82. See note 5, supra.

The father errs in asserting that the judge found a valid reason for the missed visits-specifically, the father's need to attend the trial of a brother's alleged murderer. The judge found that this was the reason the father missed a foster care review meeting, not a visit.

This factor considers whether:
"a court of competent jurisdiction has transferred custody of the child from the child's parents to the department, the placement has lasted for at least six months and the parents have not maintained significant and meaningful contact with the child during the previous six months nor have they, on a regular and consistent basis, accepted or productively utilized services intended to correct the circumstances."
G. L. c. 210, § 3(c )(iii).

The father also disputes, albeit only in the context of factor (v), see infra, the judge's conclusion that he had failed to engage in services to remedy his parenting deficiencies.

This factor considers whether:
"the child is younger than four years of age, a court of competent jurisdiction has transferred custody of the child from the child's parents to the department and custody has remained with the department for at least 6 of the immediately preceding 12 months and the child cannot be returned to the custody of the parents at the end of such 12-month period; provided, however, that the parents were offered or received services intended to correct the circumstances and refused or were unable to utilize such services on a regular and consistent basis."
G. L. c. 210, § 3(c )(v).

These included maintaining regular contact with the department, signing releases for his treatment providers to furnish information to the department, attending a father's group, taking prescription medication only as prescribed, providing the department with kinship resource information, attending court dates and foster care reviews, and providing verification of income. A department social worker confirmed his compliance with these tasks.

This factor considers whether:
"because of the lengthy absence of the parent or the parent's inability to meet the needs of the child, the child has formed a strong, positive bond with his substitute caretaker, the bond has existed for a substantial portion of the child's life, the forced removal of the child from the caretaker would likely cause serious psychological harm to the child and the parent lacks the capacity to meet the special needs of the child upon removal."
G. L. c. 210, § 3(c )(vii).

This factor considers "the willful failure to visit the child where the child is not in the custody of the parent ...." G. L. c. 210, § 3(c )(x).

This court has previously stated:
"Our cases permit a judge, who in these types of cases is the fact finder, to question witnesses in order to obtain clarification or eliminate confusion. 'In exercising their duty to direct and clarify the evidence, judges may not, however, weigh in, or appear to do so, on one side or the other; the judge must avoid the appearance of partisanship.... The rule is one of reason.' "
Adoption of Norbert, 83 Mass. App. Ct. 542, 547 (2013), quoting from Commonwealth v. Hassey, 40 Mass. App. Ct. 806, 810 (1996).

It was unnecessary for the judge, in overruling the mother's objection to the department's question about the father's substance abuse, to suggest that the mother's counsel was "cross[ing] an ethical line and represent[ing] another party, [and] I might as well have [the father's counsel] leave." The judge's initial decision to overrule the objection on substantive grounds was sufficient. Continuing on to suggest that an evidentiary objection constituted an ethical violation needlessly risked chilling counsel's advocacy.

In the principal instance cited by the father, a department social worker had already testified at some length that the department wanted the father to deal with his anger management issues. When trial resumed five days later and the social worker omitted that from her summary of the department's current concerns, it was not improper for the judge to ask questions to clarify whether anger management remained an issue. The father also complains that the judge improperly directed Leroy's counsel's examination of a department social worker on the subject of the father's controlling behavior. The judge's questions, aimed at understanding what the social worker meant and why she did not attribute the desire to control to the mother rather than the father, were not inappropriate in the circumstances.

The judge's questions were appropriately aimed at understanding the difference between a DSM-V diagnosis of a disorder and the behaviors involved in that disorder.