ADOPTION OF ILONA.[1]

Suffolk. November 1, 2010. - March 4, 2011.

Present: IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Adoption,* Care and protection, Dispensing with parent's consent, Visitation rights. *Parent and Child,* Dispensing with parent's consent to adoption. *Evidence,* Child custody proceeding.

A Juvenile Court judge, in proceedings arising from a petition for care and protection, did not clearly err in determining that the Department of Children and Families had made reasonable efforts to make it possible for the child to return safely to her mother, did not clearly err in finding no reasonable likelihood that the mother's unfitness would be temporary, and did not abuse his discretion in concluding that termination of the mother's parental rights was in the child's best interest, given the long-standing pattern of physical abuse, the impact of the mother's cognitive limitations, the lack of significant improvement in the mother's parenting and her continued failure come to grips with the problems in her relationship with the child, and the extraordinary progress that the child made with her preadoptive family. [59-62]

In proceedings arising from a petition for care and protection, the judge did not abuse his discretion in declining to order visitation with the mother and in leaving decisions about visitation to the sound judgment of the preadoptive parents. [63-66]

PETITION filed in the Suffolk County Division of the Juvenile Court Department on December 28, 2006.

The case was heard by *Joseph F. Johnston,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*William T. Cuttle* for the mother.

*Diana Cowhey* for the child.

*Brian Pariser* for Department of Children and Families.

*Andrew L. Cohen,* Committee for Public Counsel Services, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

---

[1]A pseudonym.

GANTS, J. The Department of Children and Families (department) filed a petition under G. L. c. 119, § 24, alleging that Ilona was a child in need of care and protection.[2] After five days of trial, a judge in the Juvenile Court found that Ilona's mother and father were "currently unfit, unable and unavailable to further the welfare and best interest of [Ilona]" and that their unfitness was "likely to continue into the indefinite future to a near certitude." The judge concluded that Ilona was a child in need of care and protection, and dispensed with the need for her parents' consent to adoption, guardianship, custody, or other disposition of the child pursuant to G. L. c. 119, § 26.[3] The judge ordered that Ilona be committed to the custody of the department, and found that Ilona's best interest would be served by the department's plan of adoption, which proposed that Ilona be adopted by her current foster parents. The judge also found that a significant attachment existed between Ilona and her mother and that continued contact between them was in Ilona's best interest, but declined to enter an order as to the frequency or extent of contact between them, concluding that these decisions were "best left to the informed decision making" of Ilona's pre-adoptive parents.[4]

The mother makes two arguments on appeal.[5] First, while she does not dispute that she is currently unfit as a parent, she claims that there is a reasonable likelihood her unfitness would be temporary if the department provided her with adequate support services, and that the decision to terminate her parental rights before such services were provided was improper. Second, she claims that the judge abused his discretion in declining to

[2] The petition was filed by the Department of Social Services, which is now the Department of Children and Families (department). See G. L. c. 18B, § 1, as amended by St. 2008, c. 176, § 25 (effective July 8, 2008). We use the current name.

[3] The effect of dispensing with consent to adoption is the termination of parental rights. *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 698 (1984).

[4] The judge found that there was no relationship between Ilona and her father, and declined to issue any order requiring contact between them. The judge noted that the department had not had any contact with the father through the pendency of the case.

[5] The father has not filed an appeal.

order visitation with Ilona after finding that continued contact between them was in Ilona's best interest.

The Appeals Court concluded that the judge did not err in terminating the mother's parental rights but that he abused his discretion in not ordering visitation with the mother. *Adoption of Ilona*, 76 Mass. App. Ct. 481, 488 (2010). We granted the applications for further appellate review filed by Ilona and the mother. We agree with the Appeals Court that the judge did not err in terminating the mother's parental rights, but do not agree that, in the circumstances of this case, he abused his discretion in declining to order visitation with the mother and leaving decisions about visitation to the sound judgment of the preadoptive parents. Therefore, we affirm the judgment of the Juvenile Court.[6]

*Background.* We summarize the judge's factual findings, supplemented where needed by undisputed facts in the record. Ilona was born in 1997 and is the mother's only child; Ilona's father left the mother after she became pregnant and has had no contact with the mother or child. Ilona first came to the department's attention in March and October, 2001, when two reports that the mother had physically abused Ilona were filed under G. L. c. 119, § 51A, and were found to be supported after investigation. The mother participated in a parenting class in 2000 and 2001, but her physical abuse of Ilona continued.

A third § 51A report was filed on December 27, 2006, after the police responded to a 911 telephone call from a neighbor who reported hearing screams and banging on the walls coming from the mother's apartment. When the police arrived, they found nine year old Ilona in shock, with redness and bruising on her face, hips, and arms. Ilona told the police that her mother had hit her with a belt because she did not eat her dinner, and disclosed a history of regular physical abuse by the mother. The mother initially denied physically abusing Ilona, but later admitted she hit her because Ilona had refused to eat her food. As a result of this incident, the mother was charged with assault and battery by means of a dangerous weapon, and assault and battery on a child resulting in injury. After admitting sufficient facts for a finding of

---

[6] We acknowledge the amicus brief submitted by the Committee for Public Counsel Services.

guilt as to both charges, the mother was given a continuance without a finding and placed on probation for eighteen months.

The department removed Ilona from her mother's home on the day of the incident, and on December 28, 2006, filed the instant care and protection petition in the Suffolk County Division of the Juvenile Court Department. The department was granted temporary custody of Ilona and placed her that same day in the home of the foster parents who now wish to adopt her and in whose home she continues to reside.

Before the December 27, 2006, incident, the mother had been attending weekly individual sessions with a therapist, which began in November, 2005, and monthly individual sessions with a psychiatrist, which began in May, 2006. She was diagnosed with major depression and a learning disorder, not otherwise specified. Apart from a six-month break in her therapy sessions, these weekly and monthly sessions continued after the incident and through the time of trial.

After the incident, in January, 2007, the department began providing the mother with services intended to improve her parenting skills and teach her alternative forms of discipline. In the first half of 2007, the mother completed a sixteen-week nurturing class that taught parenting skills and techniques, and a twelve-week one-on-one anger management counselling program. Although both programs were conducted in Spanish, representatives of the programs reported that the mother had difficulty understanding the concepts that were taught.[7] The mother did not demonstrate any of the skills or concepts taught in the nurturing class or make any significant change to her parenting as a result of the class. The department also recommended that the mother participate in a Department of Mental Health day program, which was designed to help with job training and job placement, but the mother declined.

Throughout its temporary custody of Ilona, the department arranged biweekly visits between Ilona and her mother, supervised by a department social worker. The social worker observed that, during most of the visits at the mother's apartment in early

---

[7]The mother's first language is Spanish. She is not fluent in English, and the extent of her ability to communicate in and understand English is unclear, but she was able to communicate in English with her social worker when necessary.

2007, the mother did not initiate any conversation or express any interest in Ilona's life, but instead watched television, cooked, or cleaned. Ilona asked her mother's permission for everything she did during a visit, including using the bathroom and getting food. When the mother prepared food for her, Ilona would eat what she was given but never ask for more, even when she was hungry, because she feared her mother's reaction. The social worker worked with the mother in order to increase her interaction with Ilona and improve her responsiveness to the child during these visits.[8]

In July, 2007, and again in September, 2007, the mother asked the department social worker if there were additional services she could participate in that would help to get her daughter back, asking specifically whether she could do the nurturing class again. She was told that she had already done it all and should continue with her outpatient counselling and mental health services.

The mother also twice sought court orders in order to obtain additional services from the department. On September 17, 2007, the mother's attorney orally asked the judge to order the department to provide family therapy for Ilona and her mother, but the judge declined. On May 14, 2008, the mother's attorney filed a motion seeking an order that the department provide licensed family therapy services or other appropriate family services, but the motion was denied.

By August 14, 2007, however, the department had changed its goal for Ilona from reunification to adoption.[9] At a permanency hearing held on November 29, 2007, in accordance with G. L. c. 119, § 29B, a judge (who was not the trial judge) determined that the department's "efforts to place the child in a timely manner in accordance with the permanency plan for the child, other than reunification, were reasonable."

---

[8]The social worker testified about some specific visits between Ilona and her mother that had gone well, and testified that the mother and Ilona talked and laughed while playing games during their visits. She acknowledged that the mother made eventual progress in some aspects of her interaction with Ilona.

[9]In changing its goal, the department relied in part on a July, 2007, parenting assessment prepared by an examiner that advised that the mother should not "at this time or in the near future . . . continue in a parenting capacity." It was later discovered that the examiner was not a licensed clinician. The judge did not rely on this discredited report in his decision.

Two Juvenile Court clinicians issued reports that were considered by the trial judge. In a report dated June 20, 2007, a clinician who had twice interviewed the mother concluded that she had a cognitive impairment, with over-all intellectual ability in the low range. While he did not make a parenting evaluation, he noted that parents with her cognitive limitations "often experience significant difficulty in adequately caring for a child, especially as the child becomes older and the developing needs of the child become more complex."

A second Juvenile Court clinician conducted a parenting evaluation after interviewing the mother twice and observing two visits between the mother and Ilona. In her April 30, 2008, report, she noted that the mother blamed Ilona for disclosing the abuse to the authorities, and had limited insight into her parenting problems and her relationship with Ilona. The clinician noted that, during the visits, there was little conversation between the mother and Ilona, and it appeared they had nothing to talk about. The clinician wrote, "It appears that in addition to being physically abusive, [the mother] was not able to meet her daughter's emotional needs and nurture her." However, the clinician was critical of the services that were provided to the mother, noting that the department had placed the mother in standard parenting interventions without evaluating her or assessing her cognitive limitations and, as a result, her placement in instructional groups with higher functioning people did not address her parenting needs or personal problems. Her report also noted that the mother's communication with the department had suffered as a result of the department's inconsistent use of interpreters.

When Ilona first arrived at her foster home, she could not read or write, was failing all subjects in school, and displayed significant behavioral problems. The foster mother received services and learned behavioral modification techniques to use with Ilona, and Ilona participated in family therapy with her foster mother. By the time of trial, Ilona's performance in school had vastly improved and she was a "different girl" — polite, affectionate, and happy.

Ilona told social workers that she wanted to be adopted by her foster family, but that she still loves her mother and wants to continue seeing her. Her foster mother, who is "very warm and

nurturing," supports continued contact between Ilona and her mother, and would continue to allow such contact as long as it did not hurt Ilona.

*Discussion.* 1. *Termination of parental rights.* In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if the parent is unfit, whether the child's best interests will be served by terminating the legal relation between parent and child. See *Adoption of Nancy*, 443 Mass. 512, 515 (2005); *Adoption of Inez*, 428 Mass. 717, 720 (1999). Here, the mother does not contest the judge's finding that she is currently unfit, but argues that there is a reasonable likelihood that her unfitness would be temporary if the department fulfilled its obligation to make reasonable efforts to provide her with the necessary services.

We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion. See *Adoption of Inez, supra*; *Adoption of Hugo*, 428 Mass. 219, 225 (1998), cert. denied sub nom. *Hugo P.* v. *George P.*, 526 U.S. 1034 (1999). Here, we conclude that the judge committed no such error.

Because termination of a parent's rights is an "extreme step," *Adoption of Carlos*, 31 Mass. App. Ct. 233, 239 (1991), *S.C.*, 413 Mass. 339 (1992), a judge must decide both whether the parent is currently unfit and whether, "on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary." *Adoption of Carlos*, 413 Mass. at 350, and cases cited. A judge may consider evidence that provides a "reason to believe that a parent will correct a condition or weakness that currently disables the parent from serving his or her child's best interests." *Adoption of Carlos*, 413 Mass. at 350. However, a judge's conclusion that a parent's unfitness is temporary must rest on credible evidence supporting a reasonable likelihood that the parent will become fit, not on a "faint hope." *Adoption of Inez, supra* at 723. Even where a parent has participated in programs and services and demonstrated some improvement, we rely on the trial judge to weigh the evidence in order to determine whether there is a suf-

ficient likelihood that the parent's unfitness is temporary. See,
e.g., *Adoption of Paula*, 420 Mass. 716, 729 (1995); *Custody of
Two Minors*, 396 Mass. 610, 620-621 (1986) ("court is permit-
ted to assess prognostic evidence derived from prior patterns of
parental neglect or misconduct in determining future fitness and
the likelihood of harm to the child"). Because childhood is
fleeting, a parent's unfitness is not temporary if it is reasonably
likely to continue for a prolonged or indeterminate period. See
*Adoption of Elena*, 446 Mass. 24, 31-32 (2006). See also *Adop-
tion of Inez, supra* at 724, quoting *Adoption of Carlos*, 31 Mass.
App. Ct. at 242 ("At some point the court must say, 'Enough,'
. . . and act in the children's best interests").

Before seeking to terminate parental rights, the department
must make "reasonable efforts" aimed at restoring the child to
the care of the natural parents. *Adoption of Lenore*, 55 Mass.
App. Ct. 275, 278 (2002). See *Petition of the Dep't of Pub.
Welfare to Dispense with Consent to Adoption*, 376 Mass. 252,
266 (1978) ("State is required to make every effort to strengthen
and encourage family life before it may proceed with plans to
sever family ties permanently"). General Laws c. 119, § 1,
declares it to be the "policy of this commonwealth to direct its
efforts, first, to the strengthening and encouragement of family
life for the care and protection of children; to assist and encour-
age the use by any family of all available resources to this end;
and to provide substitute care of children only when the family
itself or the resources available to the family are unable to
provide the necessary care and protection to insure the rights of
any child to sound health and normal physical, mental, spiritual
and moral development."[10]

---

[10]This is not simply a command of Massachusetts law; it is a Federal
mandate to which Massachusetts is required to adhere as a condition of its
receipt of Federal funds for foster care and other programs. See 42 U.S.C.
§§ 670, 671(a)(15) (2006) (requiring States to have plan that provides that
"reasonable efforts shall be made to preserve and reunify families [i] prior to
the placement of a child in foster care, to prevent or eliminate the need for
removing the child from the child's home; and [ii] to make it possible for a
child to safely return to the child's home").

Federal and State law provide that reasonable efforts shall not be required
in certain circumstances involving extreme misconduct by parents. See G. L.
c. 119, § 29C; 42 U.S.C. § 671(a)(15)(D). No party contends that any of
these circumstances is present in this case.

Where a parent, as here, has cognitive or other limitations that affect the receipt of services, the department's duty to make reasonable efforts to preserve the natural family includes a requirement that the department provide services that accommodate the special needs of a parent. See *Adoption of Gregory,* 434 Mass. 117, 122 (2001). See also 110 Code Mass. Regs. §§ 1.08, 1.09 (2008). The department must "match services with needs, and the trial judge must be vigilant to ensure that it does so." *Adoption of Lenore, supra* at 279 n.3.[11]

When committing a child to the custody of the department or terminating parental rights, a judge must determine whether the department has complied with its duty to make "reasonable efforts . . . to prevent or eliminate the need for removal from the home." G. L. c. 119, § 29C. See G. L. c. 119, § 26.[12] A judge may consider the department's failure to make reasonable efforts in deciding whether a parent's unfitness is merely temporary. See *Adoption of Carlos,* 413 Mass. at 350. However, even where the department has failed to meet this obligation, a trial judge must still rule in the child's best interest. "A determination by the court that reasonable efforts were not made shall not preclude the court from making any appropriate order conducive to the child's best interest." G. L. c. 119, § 29C. See *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, supra* at 268-269, citing G. L. c. 210, § 3. While courts protect the rights of parents, "the parents' rights are secondary to the child's best interests and . . . the proper focus of termination proceedings is the welfare of the child." *Adoption of Gregory, supra* at 121. See *Adoption of Inez,* 428 Mass. 717, 720 (1999), quoting *Care & Protection of Robert,* 408 Mass. 52, 62 (1990) ("While parents have a constitutionally recognized interest in maintaining the family unit, a 'child's interest in freedom from neglect or abuse is absolute' "). See also *Custody of a Minor,* 375 Mass. 733, 749

---

[11]A cognitive limitation "is not of itself a ground for terminating parental rights." *Adoption of Abigail,* 23 Mass. App. Ct. 191, 195 (1986). Cognitive limitation may be "relevant only to the extent that it affects the parents' capacity to assume parental responsibility." *Adoption of Frederick,* 405 Mass. 1, 9 (1989).

[12]We assume, without deciding, that the mother timely raised the question of inadequate services. See *Adoption of Gregory,* 434 Mass. 117, 124 (2001).

(1978) (best interest of child paramount consideration where child's well-being at issue).

The judge determined that the department's efforts to make it possible for Ilona to return safely to her parent were reasonable, and that the mother's unfitness was "likely to continue into the indefinite future to a near certitude." Although there was evidence of shortcomings by the department in its provision of services to the mother, the judge's finding of reasonable efforts was not clearly erroneous. The mother had the benefit of weekly counselling with a therapist, monthly sessions with her psychiatrist, a nurturing class, and one-on-one anger management training. In addition, the social worker who monitored her visits with Ilona provided individualized guidance to the mother as to how she could improve her interaction with Ilona and nurture their relationship.

Nor did the judge clearly err in finding no reasonable likelihood that the mother's unfitness would be temporary, or abuse his discretion in concluding that termination of the mother's parental rights was in Ilona's best interest. Considering the long-standing pattern of physical abuse, the impact of the mother's cognitive limitations, the lack of significant improvement in her parenting, and her continued failure to come to grips with the problems in her relationship with her daughter despite more than two years of weekly therapy, the judge did not clearly err in finding that the mother was unfit and that her unfitness was not temporary.[13] When we add to this the extraordinary progress that Ilona made when she was removed from her mother's care and came under the care of the nurturing foster family that was waiting to adopt her, we conclude that the judge did not abuse his discretion in finding that the best interests of Ilona were served by terminating her mother's parental rights. See *Adoption of Elena*, 446 Mass. 24, 30-31 (2006); *Adoption of Paula*, 420 Mass. 716, 730 (1995).

---

[13]The judge considered the nonexclusive list of fourteen statutory factors relevant in determining a parent's unfitness under G. L. c. 210, § 3, and found that nine were applicable. One of these is that, as a result of the mother's inability to provide for her child's needs, "the child has formed a strong, positive bond with [her] substitute caretaker," and the forced separation of the child from that caretaker would cause a harm which the mother was ill equipped to handle. G. L. c. 210, § 3 (*c*) (vii).

2. *Visitation order.* The judge found that a significant attachment existed between Ilona and her mother, and that continued contact is currently in Ilona's best interest. The judge noted the preadoptive mother's willingness to allow visitation between Ilona and her biological mother, but he did not enter an order requiring visitation, leaving the extent and frequency of contact between them to the "informed decision making" of the preadoptive parents. The Appeals Court concluded that the judge abused his discretion in not ordering visitation after he found that continued contact between Ilona and her mother was in Ilona's best interest. *Adoption of Ilona*, 76 Mass. App. Ct. 481, 488 (2010), citing *Adoption of Rico*, 453 Mass. 749, 754 (2009), and *Adoption of Vito*, 431 Mass. 550, 563 (2000). We disagree, and affirm the decision of the trial judge.

We have repeatedly recognized the equitable authority of a judge to order visitation between a child and a parent whose parental rights have been terminated, where such visitation is in the child's best interest. See *Adoption of Rico, supra* at 754; *Adoption of Vito, supra* at 556-561; *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 827-828, cert. denied, 528 U.S. 1005 (1999) (noting broad equity jurisdiction to order visitation). A judge may order visitation in the child's best interest in cases where the biological parents' rights are terminated but there is no family waiting to adopt the child, see *Adoption of Rico, supra* at 750, 752, and in appropriate cases where a family is ready to adopt the child on termination of the rights of the biological parents. See *Adoption of Vito, supra* at 557, 564-565; *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 702-703 (1984). See also *Youmans* v. *Ramos*, 429 Mass. 774, 777, 783-784 (1999) (affirming award of visitation to child's previous guardian after custody granted to biological father).

In determining whether to exercise the authority to order visitation, a judge must ask two questions: First, is visitation in the child's best interest? Second, in cases where a family is ready to adopt the child, is an *order* of visitation necessary to protect the child's best interest, or may decisions regarding visitation be left to the judgment of the adoptive family?

As to the first question, a judge should consider, among other factors, whether there is "a significant, existing bond with the

biological parent" whose rights have been terminated. *Adoption of Vito, supra* at 563. A judge may also take into account whether a preadoptive family has been identified and, if so, whether the child "has formed strong, nurturing bonds" with that family. *Id.* See *Adoption of Rico, supra* at 754.

Where visitation is in the best interest of the child, a judge must then decide whether an order of visitation is warranted. We have recognized that even where the child's custodian is supportive of visitation with the terminated parent, an order of visitation provides clarity and security to a child who may be worried about the loss of a relationship with the biological parent. *Id.* at 756-757. However, we have also recognized that, while a judge cannot order visitation unless it is in the child's best interest, *Adoption of Vito, supra* at 564, the best interest of the child does not by itself answer the question whether an order of visitation should enter. *Blixt* v. *Blixt*, 437 Mass. 649, 657-658 (2002), cert. denied, 537 U.S. 1189 (2003), citing *Troxel* v. *Granville*, 530 U.S. 57, 68, 69 (2000) (plurality opinion).

Adoptive parents have the same protected interest in their relationship with the adoptive child as biological parents, and are entitled to the same presumption they will act in the best interest of the child in making decisions regarding the child, including decisions about visitation. See *Adoption of Vito, supra* at 562; *Blixt* v. *Blixt, supra*; G. L. c. 210, § 6 (with exceptions not relevant here, in adoption, "all rights, duties and other legal consequences of the natural relation of child and parent shall thereafter exist" between child and adoptive parent, and shall terminate between child and natural parents); G. L. c. 210, § 6E (noting "right of an adoptive parent to make decisions on behalf of his child"). See also *Adoption of Lenore*, 55 Mass. App. Ct. 275, 284 (2002) (adoptive parents will be in best position to determine whether visits with child's biological parents will be in child's best interests); *Adoption of Gwendolyn*, 29 Mass. App. Ct. 130, 139 (1990) (same). Therefore, once a preadoptive family has been identified, a judge must balance the benefit to the child of an order of visitation that will provide assurance that the child will be able to maintain contact with a biological parent, with the intrusion that an order imposes on the rights of the adoptive parents, who are entitled to the presumption that

they will act in their child's best interest. Cf. *Blixt* v. *Blixt,*
*supra.*[14] A judge should issue an order of visitation only if such
an order, on balance, is necessary to protect the child's best
interest. See *Adoption of Rico, supra* at 757; *Blixt* v. *Blixt,*
*supra.*[15]

The Appeals Court apparently interpreted our decision in
*Adoption of Rico, supra,* to mean that a judge abuses his discre-
tion whenever he finds that visitation is in the child's best inter-
est but fails to order it. See *Adoption of Ilona, supra* at 488. We
now clarify that *Adoption of Rico, supra,* merely held that the
judge's failure to issue an order of visitation constituted an
abuse of discretion in the circumstances of that case, where a
nine year old child who had lived in four different foster homes
during the previous six years, had just lost his placement with a
preadoptive family, and had no placement with a family willing
to adopt him. *Id.* at 755. Although Rico's father was unfit, the
relationship between Rico and his father was the principal parent-
child relationship in his life, and they had formed a strong
bond. *Id.* at 754-755. The judge found that contact between Rico
and his father was in the child's best interest and should continue.
*Id.* at 752. Although the department — in whose custody Rico
remained — recognized the importance of visitation with the
father, we found that a judicial order would give the child greater
assurance that he would be able to preserve the one meaningful
parent-child relationship in his life. *Id.* at 755-757. We con-
cluded, in those circumstances, that it was an abuse of discre-
tion to fail to give the child that assurance.[16] *Id.* at 753, 759.
Therefore, *Adoption of Rico, supra,* did not establish the principle
that a judge must order visitation whenever the judge concludes

---

[14]This case does not raise the question when, if ever, an order of postadop-
tion visitation with a biological parent would violate the constitutional rights
of the adoptive parents.

[15]Even without an order of visitation, a judge may encourage the prospec-
tive adoptive parents and biological parents to enter into an agreement for
postadoption visitation or communication, which must be approved by the
judge issuing the adoption decree. See G. L. c. 210, § 6C.

[16]While an order may provide a child with assurance that visitation will
continue, we have recognized that visitation orders are subject to modifica-
tion, and that an order of visitation will be reviewed at the time of adoption to
determine whether it continues to serve the child's best interest. See *Adoption
of Rico,* 453 Mass. 749, 758-759 & n.17 (2009); *Adoption of Vito,* 431 Mass.
550, 557-558 n.15 (2000).

that visitation is currently in the child's best interest. Rather, it applied to the facts of that case the language in *Adoption of Vito, supra* at 560, 563, where we noted that "a judicial order of postadoption contact may be warranted where the evidence readily points to significant, existing bonds between the child and a biological parent," and that the court's equitable authority to order visitation "may be especially important in safeguarding the child's best interests" in cases where no preadoptive parent has been identified.

Here, as in *Adoption of Rico, supra*, the judge concluded that there was a significant bond between the child and biological parent and that continued contact between them was in the child's best interests. However, in this case, the judge also found that Ilona had a "very warm and nurturing" preadoptive mother, and that Ilona was thriving under her care. In addition, the judge found that the preadoptive mother was supportive of continued contact between Ilona and her mother, and would continue to allow such contact unless it began to harm Ilona. There is no reason to question the presumption that Ilona's preadoptive parents will act in her best interest in evaluating — now and in the future — whether continued contact with her mother is in Ilona's best interest, see *Blixt* v. *Blixt, supra* at 657-658; nor is there any compelling reason requiring that a visitation order be entered in order to protect the best interests of the child. See *Adoption of Vito, supra* at 553. The judge therefore did not abuse his discretion in leaving the issue of visitation to the sound judgment of loving adoptive parents who will be in the best position to gauge whether such visits continue to serve Ilona's best interest, rather than issuing a specific visitation order setting forth the frequency and extent of such visits.

*Conclusion.* For the reasons discussed above, we conclude that the judge did not abuse his discretion in ordering the termination of the mother's parental rights or in deciding that future visitation is "best left to the informed decision making of [Ilona's] adoptive parents."

*Decree affirmed.*