NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-189

ADOPTION OF EILEEN.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a decree entered by a judge of the Juvenile Court terminating her parental rights to the child. On appeal she contends that the ultimate finding of unfitness was not supported by clear and convincing evidence, that certain subsidiary findings regarding her behavior and the impact of her behavior on the child lacked evidentiary support, and that an order for postadoption visitation should have entered. We affirm.

Background. This case comes before us after a remand for further findings. See Adoption of Eileen, 99 Mass. App. Ct. 1104 (2020). Our review now encompasses the judge's additional findings of fact and conclusions of law. Because it is important to assess the mother's claims in context, we set forth

---

[1] A pseudonym.

a brief summary of the judge's findings, supplemented by facts in the record that support those findings.

The mother was the subject of a child in need of services petition between 2009 and 2012. The evidence of the nature of the involvement is scarce, but the judge found that the Department of Children and Families (department) became involved due to, among other things, the mother's curfew violations and substance use.

The child was born when the mother was eighteen years old. The mother was unaware of the pregnancy until her fifth month. She tested positive for marijuana and cocaine during the pregnancy, but not at the time of the child's birth.[2] The mother and the child were discharged from the hospital to the maternal grandmother's home, but the maternal grandmother informed the department that the mother and child could no longer live there. The mother and the child then lived at a teen parenting program briefly before returning to the maternal grandmother's home, where the mother remained for most of the case.

The maternal grandmother filed a report pursuant to G. L. c. 119, § 51A (51A report), on June 17, 2015, alleging that the mother had not come home until 2 A.M., and then had left the

_____

[2] The child's meconium sample was too small to be tested for substances at birth, but her urine sample was negative for substances. The G. L. c. 119, § 51A, report was supported because the child was substance exposed during pregnancy.

2

house abruptly, leaving the child with the maternal grandmother, who had indicated that she was unwilling to care for the child any longer. The allegations were supported, and the department filed a care and protection petition that same day, alleging that the child was left with an inappropriate (i.e., unwilling) caregiver. Notably, the mother addressed the department's concerns, followed through on all that was requested of her, the child was returned to her physical custody in March, 2016, and the petition was dismissed in July, 2016.

However, in the months following the dismissal of the petition, the tide changed. The mother did not go to therapy, did not participate in parenting programs, and dropped out of a nursing assistant training program. The mother attributed her inability to complete the training program to the fact that the child was unable to go to day care because of asthma and ear infections. The mother did not obtain any employment or enter another training program and was utterly reliant on the maternal grandmother for housing and support.

Beginning in October of 2016, four 51A reports were filed concerning the child.[3] A mandated reporter filed a 51A alleging

---

[3] Three of the four reports were supported. The April 7, 2017, report was screened out only because a judge of the Probate and Family Court had appointed the paternal grandmother as the child's guardian, and the child was no longer in the care of the mother. On appeal, the facts pertaining to the April 7 report are not disputed.

alcohol use by the mother while caring for the child.  In March of 2017, another 51A report was filed when the mother left the child with the paternal grandmother and did not return as promised.

On April 7, 2017, the mother again left the child with the paternal grandmother and did not return.  The social worker was unable to locate the mother and called the paternal grandmother on May 2, 2017.  The paternal grandmother reported that the mother had left the child, had not returned, and that she did not know where the mother was.  During this time the child had broken her arm, and the paternal grandmother had great difficulty obtaining medical treatment because the mother was unavailable to give consent.

The child was remained with the paternal grandmother, who had been appointed guardian, see note 3, supra, on the condition that the father (who had several children with girls under the age of sixteen) not be permitted in the home.  The paternal grandmother allowed contact with the father in the home, and the department filed a 51A report, which was supported.  The department filed another care and protection petition, and the child was removed from the paternal grandmother's home and ultimately placed in a kinship placement that became the preadoptive home.

4

In an effort to obtain a better understanding of the reasons for the mother's behavior, and the appropriate means for improving her parenting ability, the department requested that the mother participate in a neuropsychological exam, attend treatment for mental health issues, and participate in a substance use evaluation. Referrals were made for all three services. The mother did not successfully complete any of these three critical tasks.

Specifically, no neuropsychological evaluation was performed. The social worker provided a referral, but the mother did not call for an appointment. The provider reached out on several occasions but reported to the department that they received no response from the mother. Even though the 51A report regarding the mother's intoxication was supported based on family members expressed concern about the extent of the mother's drinking and marijuana use, the mother did not follow up on a referral for a substance use evaluation. The mother agreed to attend what she described as "bullshit therapy," and attended counselling for a brief period. The program terminated services in January of 2018 when she missed two visits. The mother did not participate in therapy again until two weeks before trial. She did, however, complete the Parenting Journey class in 2018, although she appeared to have difficulty describing what she had learned. The judge found that the

5

mother was unable to demonstrate that she had benefited from the few services in which she engaged.

The mother was frequently unavailable for monthly visits by the social worker. She did not visit the child regularly, despite the fact that she was not working or going to school. She missed approximately twelve visits while the child was in foster care, failed to cancel the scheduled visit in advance, and was unavailable by telephone. She also missed two of three foster care reviews and some court dates. The judge did not credit her reasons for missing the foster care reviews. The mother testified that she missed the court dates due to an "emergency," but when asked what the emergency was, she declined to answer and replied, "No response" twice.[4] The judge did not credit this response.

---

[4] The mother's action plan contained twelve components, several of which were related to organizational and independent living skills. On appeal the department and the child also argue that the mother should be declared unfit because she has not secured her own housing, was not employed, and had not prepared a household budget. We view these action plan tasks as secondary to the primary goals of improving the mother's mental health, wellness, and overall stability, and ensuring that the child would not be neglected or abandoned in her care. Many people reside in multigenerational households, are unemployed, and lack budgeting skills, but possess the maturity and wherewithal to care for their children. We understand the mother's apparent inability to make a plan to care for the child to be evidence of a larger (and as yet undefined and unaddressed) constellation of problems that place the child at risk of neglect. To the extent that one or both appellees ask us to uphold the termination of parental rights based on one or more of these secondary factors alone, we decline to do so.

6

Discussion. 1. Termination of parental rights. "In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if the parent is unfit, whether the child's best interests will be served by terminating the legal relation between parent and child." Adoption of Ilona, 459 Mass. 53, 59 (2011). "A finding of unfitness must be supported by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence. See Adoption of Elena, 446 Mass. 24, 30-31 (2006). 'We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion.' Adoption of Ilona, supra." Adoption of Patty, 489 Mass. 630, 637 (2022).

This case required the judge to assess the risks posed to the child based on the mother's past history of neglect, and on one occasion, apparent abandonment. Viewed through this lens, we can not say that the judge's findings were unsupported, or that the judge abused her discretion in deciding that the risk of ongoing neglect was so severe that the child's best interests would be served by termination of parental rights. "The judge properly considered the mother's continued failure to cooperate

with the department in determining that the mother did not have the ability to address her own shortcomings as a parent." Care & Protection of Vieri, 92 Mass. App. Ct. 402, 405 (2017). On the evidence before her, the judge was permitted to find that the mother repeatedly left the child with caregivers and did not return, did not understand what being a parent required, and did not appreciate the impact of her own shortcomings on the child.

The reasons for the mother's behavior were unclear. The mother has a childhood history of alcohol and drug use, and although she had cared for the child while impaired, she did not follow through on a referral for an evaluation of substance use issues, nor did she attend more that a handful of the counselling sessions designed to assist in addressing any mental health needs she may have had. Because of the mother's noncooperation, the judge was unable to make any findings regarding the mother's substance use and mental health. Instead, the judge was left with a pattern of behavior indicative of neglect of the child, and an apparent inability to follow through on even the most basic of tasks designed to effectuate reunification. "The judge could properly consider past parental conduct as relevant to the issue of current parental fitness where that conduct was not too remote, especially where the evidence supported the continuing vitality of such conduct." Adoption of Larry, 434 Mass. 456, 469 (2001).

8

On appeal the mother points to the parenting classes, the fact that she had started therapy again shortly before trial, and that she was going to start a job to demonstrate that she was on an "upward trajectory."  The judge explicitly considered the mother's recent efforts but concluded that the mother's very recent participation in services did not demonstrate a reasonable likelihood that she would become fit in the future.  Rather, the judge found that the mother did not understand what her parental obligations were or how to fulfill them.  At trial the department had demonstrated grievous shortcomings based on her past conduct, but the mother did not offer any explanation why she had stopped attending therapy in the past and had not undergone the requested evaluations.[5]  She did not describe what she would do differently in the future, other than to promise to get the counselling and evaluations listed in her action plan.  She refused to explain why she missed court dates, offered no explanation for the missed visits with the child, and gave no explanation as to why she had previously left the child with others.  Even after taking a parenting course, she was unable to

---

[5] She testified that a substance use evaluation was not part of her action plan and that she did not try to contact the healthy baby program to which she had been referred.  She claimed that date of the foster care review had been changed and that the social worker told her that she did not have to attend, explanations the judge did not credit.  She promised she would participate in a substance abuse program and counselling in the future, and hoped to regain custody.

describe what she learned, or the developmental needs of a three year old. The judge did not find what explanations the mother did give to be credible, nor did the judge find that the mother had improved her parenting skills. "Evidence such as the failure of the parents to keep a stable home environment for the children, the refusal of the parents to maintain service plans, visitation schedules, and counseling programs designed to strengthen the family unit are relevant to the determination of unfitness." Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption, 399 Mass. 279, 289 (1987). We discern no error.

We recognize that the visits between the mother and child, when they occurred, went well, and that there was apparent affection between them. "Despite the moral overtones of the statutory term 'unfit,' the judge's decision was not a moral judgment." Adoption of Bianca, 91 Mass. App. Ct. 428, 432 n.8 (2017). A judge may find that a mother loves and provides for her child to the best of her ability, but nonetheless reach the conclusion that the best interests of the child warrant termination of parental rights. In this case, the evidence supported the judge's finding that the child would be at risk of neglect or abandonment in the mother's care, and that termination was in the best interests of the child.

2. <u>Visitation</u>. The judge ordered one posttermination visit with the mother but left postadoption visitation to the discretion of the adoptive parent. "In determining whether to exercise the authority to order visitation, a judge must ask two questions: First, is visitation in the child's best interest? Second, in cases where a family is ready to adopt the child, is an <u>order</u> of visitation necessary to protect the child's best interest, or may decisions regarding visitation be left to the judgment of the adoptive family?" <u>Adoption of Ilona</u>, 459 Mass. at 63. "[O]nce a preadoptive family has been identified, a judge must balance the benefit to the child of an order of visitation . . . with the intrusion that an order imposes on the rights of the adoptive parents, who are entitled to the presumption that they will act in their child's best interest." <u>Id</u>. at 64-65. Given the past history of inconsistent care and inconsistent visitation, the judge did not abuse her

11

considerable discretion in leaving the matter of postadoption visitation to the adoptive parent.

*Decree affirmed*.

By the Court (Vuono,
  Sullivan & Singh, JJ.[6]),

*Joseph F. Stanton*

Clerk

Entered:  March 13, 2023.

---

[6] The panelists are listed in order of seniority.