NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-72

ADOPTION OF NAIRA (and two companion cases[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a trial, a Juvenile Court judge found that the father was unfit to parent the child, Naira, and that her best interests would be served by the terminating his parental rights and placing the child with her preadoptive parents.  The judge also declined to order visitation between the father and the three children who were the subject of the petition at the time of trial.  The father appeals from the decrees, arguing that the judge did not sufficiently consider the father's competing adoption plan for the child and should have ordered posttermination and postadoption visitation with the three children.  We affirm.

---

[1] Adoption of Philip and Adoption of Braedon.  The children's names are pseudonyms.

Background.  The child was born in 2011; her biological parents are the mother and the father.  Her four siblings include two boys (boys), one about one year older and the other about three years younger than the child; the father is the biological parent of the younger boy.[2]  Between July 2014 and May 2018, five reports pursuant to G. L. c. 119, § 51A (51A reports), were filed alleging neglect of the children, one of which alleged that in 2017 the father held a knife to the mother's throat in the children's presence.

On September 16, 2018, a 51A report was filed alleging neglect of the child and the boys by the father; it identified the father by an alias.  That 51A report alleged that, after the mother found naked photographs of other women on the father's cell phone, they argued and the father choked the mother.  Two days later, three more 51A reports were filed alleging, among other things, that the mother and the father of her two oldest children were involved in stabbing a man in the presence of the child and one of the boys.  The Department of Children and Families (DCF) conducted an emergency removal of the children and instituted these care and protection proceedings.

_____

[2] During these proceedings, in the fall of 2023, it was determined that the father is not the biological parent of the older boy.  The mother is the biological parent of both boys. The mother also has an older son and daughter who were removed from the petition after they reached age eighteen.

Beginning on October 2, 2018, the child was placed with the foster parents, who became her preadoptive parents. As of trial the child had been with the preadoptive parents for more than five years. The boys were in many different foster placements, sometimes separately, for about the next four years.

Because the name DCF had for the father was an alias, DCF struggled to locate him, delaying his visitation with the children. When a social worker telephoned the father in November 2018 and asked whether his name was his true name or the alias, the father hung up. The father's use of an alias also impeded DCF's identification of possible kinship placements. In March 2019, the father contacted DCF, and he was served with the care and protection summons in April 2019. The father was offered weekly supervised visits with the child and the boys, which were changed to biweekly after the father failed to attend them consistently.

On June 25, 2019, DCF changed its goals for the child and the boys to adoption. At that point DCF's plan was to recruit an adoptive family for those three children. The father told DCF that he wanted the children to be placed with his aunt (great aunt). In August 2020, however, the mother's older daughter, then about fifteen, was placed in the same foster home as the child. The adoption social worker contacted the great aunt and asked if she could take those four children; the great

3

aunt said she could take only the child and the boys, and only after her upcoming move from Connecticut to Florida. By then the child had been with her preadoptive parents for almost two years, and her biological sister was also living there.[3] DCF decided to move forward with the Interstate Compact on the Placement of Children (ICPC) process to place the boys with the great aunt in Florida.

In early 2021, after about nine months of video conference visits because of the COVID-19 pandemic, in-person supervised visits resumed between the father and the child. During two visits in early 2021, the father pulled the child's hair and insisted that she sit on his lap; the child was then about ten years old. After that, the child reported to DCF that she was uncomfortable attending visits with the father, and for the next three years refused to participate in them despite encouragement from DCF. Based on the father's testimony that his interactions with the child were appropriate and that she said they made her uncomfortable only because DCF had "brainwashed" her, the judge found that he "continually dismissed [the child]'s concerns and refused to take responsibility for his behavior that led to her refusal to attend visits." During his subsequent visits with

---

[3] The sister left that placement in November 2021. The child's preadoptive parents continued to maintain regular contact between the child and the sister.

the boys, the father spent a significant amount of time perseverating on the child's absence; when a social worker repeatedly tried to redirect his attention, the father told her to "go fuck [her]self."  The judge found that the father could not control his anger in front of the children and his focus on the child's absence prevented him from taking advantage of his limited visitation time with the boys.

In June 2022, DCF and the child moved to suspend the father's visits with her.  A Juvenile Court judge allowed the motion but ordered DCF to ask the child monthly whether she would like to visit the father.  The child consistently said that she did not want to do so.

In January 2023, the boys were placed with the great aunt in Florida.  The child's preadoptive parents and the great aunt facilitated telephone and video contact between the child and the boys, and on one occasion they all met at an amusement park.

The judge credited the testimony of the child that she was happy in her preadoptive home and wanted to remain there and be adopted by the preadoptive parents.  The child consented to being adopted by the preadoptive parents, but did not consent to an adoption by the great aunt.[4]  Despite the child's testimony,

---

[4] Because the child was above the age of twelve, any adoption would require her written consent.  G. L. c. 210, § 2.

5

both the father and the great aunt maintained that the judge should order the child to be moved to Florida and be adopted by the great aunt.

The father has a criminal history including the use of multiple aliases and New York convictions for selling narcotics and possession of a forged instrument.  While this trial was ongoing, he was arrested for firearms and drug trafficking offenses and held in a house of correction.  At the time of trial he had twelve open Massachusetts criminal cases.

Police have responded to more than a dozen reports of domestic disputes between the father and the mother, some of which involved allegations of the father's violence toward the mother in front of one or more of the children.  For more than five years before trial, the father was repeatedly tasked with engaging in domestic violence services including a batterer's intervention program, but he did not complete those programs. He testified that the mother's allegations of domestic violence were "a lie" and that he did not believe he needed to participate in those programs.  He told DCF that he was not interested in participating in any services because he was not seeking reunification with the children and wanted them to be placed with the great aunt.  The judge found that the father had failed to take responsibility for his actions regarding domestic disputes with the mother.

6

At trial, the father did not contest the termination of his parental rights, but argued that the child should be placed with the great aunt and the boys.  The judge terminated the father's parental rights to the child and approved DCF's plan for her adoption by her preadoptive parents.  The judge also terminated the father's parental rights as to the younger boy and approved the plan for both boys' adoption by the great aunt.  As to visitation, the judge concluded that it was not in the best interests of the child or the boys to order posttermination or postadoption contact with the father.  As to sibling visitation, the judge ordered DCF and the preadoptive parents of the child and the boys to ensure that at least one contact a month, either a telephone call or a video call, be arranged among them.  The father has appealed from the decree issued with regard to Naira and so much of the decrees pertaining to the two boys as related to visitation.[5]

Discussion.  1.  Competing adoption plan.  The father argues that the judge abused her discretion in choosing the adoption plan proposed by DCF rather than the father's plan for the child to be adopted by the great aunt.  The father contends that the judge did not sufficiently compare the competing plans,

_____

[5] The judge also terminated the mother's parental rights as to the child and the boys.  The mother has not appealed from any decree.

disregarded DCF's failure to work with him in furthering his goal of keeping the child with the boys, and ignored the DCF regulations prioritizing kinship placement, see 110 Code Mass. Regs. § 7.101(2)-(3) (2009).

The father argues that the judge did not perform a meaningful evaluation of the two competing adoption plans. When DCF and a parent propose different adoption plans, the judge must consider both and "determine which placement will serve the best interests of the child." Adoption of Dora, 52 Mass. App. Ct. 472, 474-475 (2001). In deciding between two competing adoption plans, the judge must "'meaningfully . . . evaluate' what is proposed to be done for the child." Id. at 475, quoting Adoption of Lars, 46 Mass. App. 30, 31 (1998), S.C., 431 Mass. 1151 (2000). The judge's evaluation must include "an 'evenhanded' assessment of all the facts surrounding" the two plans. Adoption of Hugo, 428 Mass. 219, 226 n.8 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999). We review the judge's choice between competing adoption plans for an abuse of discretion. See Adoption of Breck, 105 Mass. App. Ct. 652, 663 (2025).

We conclude that the judge conducted a meaningful evaluation of the competing adoption plans. As to DCF's plan, the judge considered the testimony of the child, who wished to remain with the preadoptive parents, and that of the adoption

8

social worker, who described the many ways the preadoptive parents had met the child's needs during the more than five years that she had been in their care.

As to the father's plan, the judge considered the testimony of the father and the great aunt that the child belonged with the great aunt and the boys because they were biologically related. The judge found that DCF "expressed no concerns" about the great aunt's ability to provide for the boys' needs. However, the judge concluded that "[w]hile [the great aunt] is an appropriate adoptive home for [the boys], she is not the best plan for [the child]." The judge found that the child "had met [the great aunt] but did not have a relationship with her." During the first seven years of the child's life, the great aunt saw the child only four or five times; after the child entered DCF custody, the great aunt saw the child only once in person. The judge found that the great aunt "clearly stated to the court that she did not know anything about [the child]." The great aunt did not know the child's grade in school or whether she had any behavioral or mental health issues. In her conversations with the adoption social worker, the great aunt did not ask to visit the child or ask about her medical or mental health history.

The judge's detailed fact finding about the viability and propriety of placing the child with the great aunt met the

9

requirement of a meaningful evaluation of the father's competing adoption plan.  See Adoption of Breck, 105 Mass. App. Ct. at 664.  As for the father's argument that the judge was required to "develop a side-by-side comparison of the competing plans," we do not read Massachusetts case law to require that, for a judge's evaluation of the competing plans to be meaningful, the judge must compare each individual aspect of the plans.  That is particularly so here, where the judge was comparing a plan to keep the child with the preadoptive parents, where she had been for more than five years, with a plan to place the child with the great aunt, a biological relative with whom, the judge found, the child "did not have a relationship."  See Adoption of Jacob, 99 Mass. App. Ct. 258, 272-273 (2021) (no abuse of discretion in choosing DCF plan of adoption by recruitment over competing plan for child to remain with paternal grandparents).

Nor, contrary to the father's argument, was DCF required to place the child with the boys because they are her biological siblings.  See Adoption of Ulrich, 94 Mass. App. Ct. 668, 679-680 (2019) (no abuse of discretion in approving adoption plans that separated siblings).

As for the relevant DCF regulation prioritizing kinship placement, 110 Code Mass. Regs. § 7.101(2), it requires that DCF "shall consider, consistent with the best interests of the child," a child's "kinship family" as the first of several

10

placement resources. DCF did consider placement of the child with the great aunt. We conclude that the judge acted within her discretion in finding that placement of the child with the great aunt would not be in the best interests of the child. See Adoption of Xarissa, 99 Mass. App. Ct. 610, 621 (2021).[6]

2. Visitation. The father also argues that the judge abused her discretion in declining to order posttermination and postadoption visitation between him and "his children," which we take to mean the child and both boys. "A trial judge's decision whether to order visitation between a child and a parent whose parental rights have been terminated is reviewed for an abuse of discretion." Adoption of Xarissa, 99 Mass. App. Ct. at 623-624. "A judge should issue an order of visitation only if such an order, on balance, is necessary to protect the child[ren]'s best interest[s]." Adoption of Ilona, 459 Mass. 53, 65 (2011).

---

[6] In his reply brief, the father argues for the first time that the judge failed to consider that the grand aunt shares his Jamaican heritage. We decline to consider any argument raised for the first time in a reply brief. See Care & Protection of Jaylen, 493 Mass. 798, 808 n.23 (2024). We note that the father misplaces his reliance on Adoption of Mariano, 77 Mass. App. Ct. 656, 662 (2010), in which a Probate and Family Court judge ruled that a divorcing couple could not negotiate for the father to relinquish his parental rights to a child who "shares a unique physical, genetic and ethnic connection with his birth father." This court upheld the order denying the mother's petition for adoption as not in the child's best interests in terms of "filial ties." Id. at 662-663. That case is inapposite.

11

Putting aside the question whether the father has standing to seek visitation with the older boy, who is not his biological child, cf. Adoption of Franklin, 99 Mass. App. Ct. 787, 803-804 (2021), we conclude that the judge did not abuse her discretion in declining to order visitation between the father and any of those three children.  For more than three years before trial, the child had refused visits with the father, and the father failed to take responsibility for his behavior that caused her refusal.  See Adoption of Daisy, 77 Mass. App. Ct. 768, 783 (2010), S.C., 460 Mass. 72 (2011) (DCF "was not in a position to force an eleven year old child to attend visits against her will").  In visits with the boys, the father's behavior escalated because of the child's absence, and as a result of his failure to pay attention to the boys, DCF reduced his visits with them.  Between May and November 2023, the younger boy refused to attend all but one visit with the father.  During the approximately two year period before trial, the father attended only three virtual visits and one in-person visit with the boys.  Based on these facts, the judge found that the father did not have a bond with the child or with either boy and that it is not in the best interests of the children to order posttermination or postadoption contact with the father.  The judge did not

12

abuse her discretion in so finding.  See Adoption of Ilona, 459 Mass. at 63-66.

Decrees affirmed.

By the Court (Shin, Grant &
  Hershfang, JJ.[7]),

Clerk

Entered:  September 19, 2025.

---

[7] The panelists are listed in order of seniority.