NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-91

ADOPTION OF PEPPER.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The father appeals from a 2024 decree issued by a judge of the Juvenile Court terminating the father's parental rights as to Pepper.[2]  We affirm the decree.

Background.  Pepper was six years old when this care and protection proceeding was initiated, and ten years old at the time of trial.  The judge terminated the father's rights based on the father's "long absence from [Pepper's] life," his "lack of a relationship" with Pepper, her "relationships and growth in the pre-adoptive home," her "high needs," the Maine child welfare authorities' disapproval of the proposal that the father assume custody of Pepper, the father's "having signed a

---

[1] A pseudonym.

[2] The mother stipulated to the termination of her parental rights and is not involved in this appeal.

substantiation letter for the sexual abuse of a ten-year-old girl that had been living in his household," his "refusal to engage with or provide releases for services," his "minimal engagement with [Pepper] for the pendency of the case," and his "evasive and performative testimony" at trial. The judge found these to be "prognostic of [the father's] long-term accountability and reliability." There was "clear and convincing evidence that he is unfit to provide consistent and stable parenting for [Pepper's] high needs" -- a circumstance that "will continue into the foreseeable future" -- and that Pepper's best interests would be served by terminating the father's rights.

Discussion. On appeal, the father argues that the judge's unfitness determination was undermined by erroneous findings that Pepper would be at risk of sexual abuse if placed in the father's care and that he had no sufficient plan for transitioning Pepper to his care. The father also asserts that the Department of Children and Families (department) failed to make reasonable efforts to place Pepper with the father. Finally, the father argues that the judge abused her discretion in declining to order postadoption visitation.

We review "to determine whether the judge's findings were clearly erroneous and whether they proved parental unfitness by

2

clear and convincing evidence." Custody of Eleanor, 414 Mass. 795, 802 (1993). "[S]ubsidiary evidentiary findings need only be proved by a fair preponderance of the evidence." Care & Protection of Laura, 414 Mass. 788, 793 (1993). "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011).

1. Unfitness. a. Risk of sexual abuse. The father argues that the finding of his unfitness cannot stand because it relied on a clearly erroneous finding that there was "a substantial risk of sexual abuse were [Pepper] to be in [the father's] care." This finding was in turn based largely on the judge's finding that, in 2009, the father signed a "substantiation letter" regarding sexual abuse of a ten year old girl in his household in Maine.

The evidence plainly supported the findings that the father both signed such a letter and knew that it alleged such abuse. The letter itself, however, is not in the record, nor does the record describe, or cite to Maine law describing, the content of such a letter or the legal effect of a parent's signing it. There is insufficient evidence to show that the father's signing

3

it amounted to an admission of guilt or of the strength of the evidence against him.  Therefore, we cannot say the finding that the father currently poses a risk of sexual abuse to Pepper is supported by the record.  Nevertheless, the error was harmless, because the remaining evidence supporting the judge's ultimate finding of unfitness was very strong.  Taken as a whole, and without considering the risk of sexual abuse, there was clear and convincing evidence of unfitness.

b.  Transition plan.  The father also argues that the judge, as part of the reasons for finding him unfit, erroneously found fault with his plan for transitioning Pepper to his care. The father asserts that although his plan provided for "incremental" transitions of Pepper -- from her foster family's home in Massachusetts to a home he had access to in southern Maine, and eventually to his own residence much farther north in Maine -- this was not a flaw, because the plans envisioned by the department's own policies are likewise incremental.

But the judge did not take issue with the father's plan because it was incremental.  Rather, she found that his plan lacked details, such as what schools Pepper would be attending, and where, during various phases of the plan.  She found that his plan gave no consideration to how Pepper would access needed services during the transitions, particularly where the

4

transitions were likely to affect her "socially, emotionally, [and] academically."  She found that his plan was unrealistic, in that it provided for flying Pepper from Maine to southern Massachusetts every other weekend, even while the father claimed to have "limited means"; and thereafter, the father expected the foster family to drive three children on an eight to ten-hour round trip to Maine in order to ease Pepper's transition.[3]  She found it "so vague, so disorganized, [and] so inconsistent" as to amount to no concrete plan at all.

The father does not claim that any of the judge's specific findings about his transition plan were clearly erroneous.  Nor do we see any error in those findings.  It was therefore proper for the judge to consider the flaws in the father's transition plan as further evidence of his unfitness to care for Pepper. We see no basis to disturb the unfitness determination.[4]

2.  <u>Reasonable efforts</u>.  The judge found that the department made reasonable efforts to unify the father and

---

[3] Pepper resides with three half-siblings.

[4] Although the father, in his reply brief and at oral argument, raised in passing various other claims of erroneous subsidiary findings relative to unfitness, we do not consider them.  "No new issues shall be raised in the reply brief." Mass. R. A. P. 16 (c), as appearing in 481 Mass. 1628 (2019). See <u>Travenol Labs., Inc</u>. v. <u>Zotal, Ltd</u>., 394 Mass. 95, 97 (1985).  And we need not consider "arguments raised for the first time at oral argument."  <u>Santos</u> v. <u>U.S. Bank Nat'l Ass'n</u>, 89 Mass. App. Ct. 687, 700 n.14 (2016).

Pepper, "specifically by seeking an Interstate Compact Placement approval [to place Pepper with the father in Maine,] (which was denied)[;] by offering the father an action plan identifying steps he could take to support eventual placement of [Pepper] with him[;] and by providing the father with opportunities to establish a relationship with [Pepper]."

The father nevertheless argues that, because the department changed the goal for Pepper to adoption in late 2021 -- before the father received "notice by certified mail" of Pepper's care and protection proceeding -- the department did not make reasonable efforts at unification. The judge, however, found the father's testimony on this and many other issues to be not credible, exhibiting a "pattern of mendacity." She found that the father had actual knowledge in late 2020 that the department had removed Pepper from the mother's custody. Yet the father did not begin interacting with the department until June 2022. There is thus no merit to the father's claim that the department failed to give him a fair chance before changing Pepper's goal to adoption. "The department's obligation to make reasonable efforts to []unify the child with the [father was] contingent upon [his] obligation to substantially fulfill [his] parental responsibilities (including seeking and using appropriate services)" (emphasis added). Adoption of Yalena, 100 Mass. App.

6

Ct. 542, 554 (2021).  See Adoption of Daisy, 77 Mass. App. Ct. 768, 781 (2010), S.C., 460 Mass. 72 (2011).

The father also argues that the department unreasonably disregarded his request to increase visits with Pepper, thereby precluding a finding that it made reasonable efforts.  Yet the judge found that the father's own unresponsiveness to the department's requests for releases, and his failures to keep in touch with the department, led to the absence of visits in April, May, June, and July of 2024.  Any lack of visitation cannot be laid at the department's feet.

In his brief, the father mounts additional challenges to the department's reasonable efforts.  But the docket contains no suggestion that the father raised these arguments before trial by way of an abuse of discretion motion, motion to compel reasonable efforts, or otherwise.  Nor, judging by the father's closing argument, were these challenges pressed at the trial itself.  These arguments are therefore waived.  See Adoption of Mattis, 106 Mass. App. Ct. 548, 551 (2026).

3.  Postadoption visitation.  The father asserts that the judge abused her discretion in declining to order postadoption visitation.  In making such a decision, a judge must answer two questions.  "First, is visitation in the child's best interest? Second, in cases where a family is ready to adopt the child, is

7

an order of visitation necessary to protect the child's best interest, or may decisions regarding visitation be left to the judgment of the adoptive family?" Adoption of Ilona, 459 Mass. at 63. We review the judge's decisions on these issues for abuse of discretion. See Adoption of Zander, 83 Mass. App. Ct. 363, 365-366 (2013).

Here, the judge found that it was in Pepper's best interests to maintain postadoption contact. The judge also found, however, that Pepper's interests would be adequately served by leaving such visits to the adoptive parents' discretion. This comported with the judge's responsibility to balance "the benefit to the child of an order of visitation that will provide assurance that the child will be able to maintain contact with a biological parent" against "the intrusion that an order imposes on the rights of the adoptive parents, who are entitled to the presumption that they will act in their child's best interest." Adoption of Ilona, 459 Mass. at 64-65.

The father identifies no specific manner in which the judge abused her discretion by so concluding. The father argues instead that, because the judge ordered the department to provide the father with three visits per year before Pepper is adopted, there should be a presumption in favor of ordering the adoptive parents to provide some visits after adoption. What

8

this overlooks is that, unlike the department, "[a]doptive parents have the same legal rights toward their children that biological parents do. . . . Parental rights to raise one's children are essential, basic rights that are constitutionally protected." Adoption of Vito, 431 Mass. 550, 562 (2000). Unlike a visitation order to the department, a visitation order to the adoptive parents would intrude on their constitutional rights. The father cites no case recognizing any presumption in favor of such an order, nor are we persuaded that such a presumption is warranted.

Decree affirmed.

By the Court (Rubin, Sacks & Smyth, JJ.[5]),

Clerk

Entered: April 2, 2026.

---

[5] The panelists are listed in order of seniority.

9