NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-1236

ADOPTION OF MATEO.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a trial, a Juvenile Court judge found that the mother was unfit to parent Mateo, now thirteen years old, and that Mateo's best interests would be served by the termination of the mother's parental rights.[2]  The mother appeals from the decree terminating her parental rights.  She argues that the determination of her unfitness was premature because at the time of trial she was on a trajectory that showed she soon would become fit to care for Mateo; the Department of Children and Families (DCF) did not make reasonable efforts to restore Mateo to her care; and the judge did not sufficiently consider Mateo's best interests in declining to mandate posttermination visits.  We affirm.

---

[1] A pseudonym.

[2] The judge also entered a decree terminating the father's parental rights.  The father did not appeal.

Background.  Mateo was born in May 2010.  In March 2013, a report pursuant to G. L. c. 119, § 51A (51A report), was filed alleging neglect of Mateo by the mother.  The subsequent investigation by DCF pursuant to G. L. c. 119, § 51B (51B investigation), substantiated concerns regarding the behavior of the mother, who was struggling with substance use disorder.[3] From March 2013 until June 2014, the mother left Mateo in the care of her aunt (first aunt).  During this time, the mother completed treatment related to alcohol and domestic violence and attained ten months' sobriety.

In the spring of 2014, Mateo, then four years old, returned to live with the mother, who was in a relationship with a male partner.  In September and October 2014, three 51A reports were filed that included allegations that the mother had neglected Mateo by exposing him to domestic violence.  After 51B investigations, the allegations of neglect by the mother were supported.  At trial, the mother testified that she did not recall that that partner was a registered sex offender; she described him as a "severe alcoholic" who was physically abusive to her but never hurt Mateo.  The judge found that in 2014 Mateo witnessed domestic violence in the home.

---

[3] The mother has two older children, born in 1993 and 1997, who were raised by other relatives because of the mother's addiction struggles, mental health issues, and pattern of violent relationships.

2

On October 24, 2014, two more 51A reports were filed alleging sexual abuse of Mateo. The mother told a DCF social worker that Mateo had told her that while in the care of the first aunt he was sexually abused by a cousin. After a 51B investigation, the allegations of sexual abuse by the cousin were unsupported.[4]

In 2016, the mother married another man, and remained married to him at the time of trial. In July 2016, the mother brought Mateo to a Fourth of July party at the home of a different aunt (second aunt), who Mateo had never met. The second aunt agreed to care for Mateo for the weekend. The mother later called the second aunt and asked her to watch Mateo while the mother found a treatment program. Between then and the end of August, the mother visited Mateo only once. On August 26, 2016, a 51A report was filed alleging neglect of Mateo by the mother and sexual abuse of Mateo by the mother's husband. After a 51B investigation, those allegations were supported. At trial, the mother testified at first that she had no memory of those allegations against her husband, then said that the second aunt had made them up because her husband had stopped giving the second aunt money.

---

[4] During a forensic interview, then four year old Mateo made vague disclosures about the cousin.

3

In September 2016, the Probate and Family Court granted guardianship of Mateo to the second aunt. In April 2017, the second aunt filed a petition in the Juvenile Court alleging that Mateo was a child requiring assistance, G. L. c. 119, § 21, because of concerning behaviors. Also in April 2017, a 51A report was filed alleging sexual abuse of Mateo by three adult men while in the mother's care. After a 51B investigation, allegations of sexual exploitation by the mother were unsupported. That spring, Mateo was placed in a residential treatment program for six weeks, after which he returned to the second aunt's care.

In August and November 2017, 51A reports were filed alleging sexual abuse of Mateo by the mother. After a 51B investigation, the allegations in the November 2017 51A report were supported. Due to her difficulty in managing Mateo's problematic behaviors, the second aunt relinquished her guardianship. To prevent custody reverting to the mother, DCF filed this care and protection petition seeking temporary custody of Mateo.

The mother did try to address her challenges. She was diagnosed with bipolar II disorder, posttraumatic stress disorder, anxiety disorder, and alcohol use disorder, and began seeing a psychiatrist biweekly. She also attended Alcoholics Anonymous (AA) meetings, an intensive outpatient program for

4

substance abuse, a sober parenting program, and weekly counseling on domestic violence.  Throughout 2018, police received dozens of calls to respond to the mother's home, many of which involved domestic violence between her and her current partner.

From November 2017 until January 2020, Mateo lived in a group home where he received intensive therapy for issues including sexual trauma.  At first, his clinician did not recommend visits between Mateo and the mother.  In early 2018, the DCF ongoing social worker made multiple unsuccessful attempts to contact the mother, but her telephone would not accept voicemails, an action plan mailed to her was returned to sender, and when the social worker made an unannounced visit the mother was not home.  The mother and Mateo had supervised telephone calls beginning in May 2018, supervised visits beginning in July, and two unsupervised visits in late 2018.  In November 2018, the mother relapsed and was arrested and charged in the District Court with offenses including assault and battery on a police officer, assault and battery by means of a dangerous weapon, disorderly conduct, and resisting arrest.  As a result of the relapse, the mother's visits with Mateo were again supervised.

In April 2019, when Mateo was almost nine years old and still living in the group home, DCF's goal for him was changed to adoption. DCF began looking for a foster family for him.

The last in-person visit between the mother and Mateo was in the fall of 2019. In November 2019, the mother again relapsed. She stopped attending the substance abuse program. On November 25, 2019, the mother was charged in the District Court with trespassing and assault and battery on a pregnant person.[5] Warrants issued in both District Courts with open cases.

For the next two years the mother was "on the run," moving from place to place and avoiding communication with DCF because she did not want to be arrested on her open warrants. During that time she was abusing alcohol and not taking her prescribed medication. For those two years, the mother refused to give DCF any information about her location, or about any services or treatment providers she was accessing. As a result, she was not in compliance with her DCF action plan. At trial she testified that during those years she was staying at a Salvation Army program in New Hampshire.

---

[5] The mother had previously been convicted of crimes including 2006 charges of possession of a hoax explosive device, armed robbery, and unarmed robbery.

6

In January 2020, Mateo was placed with a foster family, where he at first received individual and group therapy, as well as psychiatric treatment.  After a few weeks it was determined that he did not need such a high level of services, and in August 2020 he began weekly individual therapy.  Although the mother refused to tell DCF where she was living, the mother and Mateo continued telephone calls; at first they were supervised by the foster mother, until during one call the mother discussed something that upset Mateo, and so the foster mother no longer wanted to supervise the calls.  Beginning in July 2020, the ongoing DCF social worker supervised the calls; he tried to schedule in-person visits between the mother and Mateo but was unable to do so.

In July 2020, a preadoptive licensing study was approved for a couple interested in adopting Mateo.  On December 30, 2020, Mateo moved to the preadoptive parents' home, where they live with their son who is about two years younger than Mateo and is also adopted.  Because of his transition to the preadoptive home, Mateo's treatment with his previous therapist was discontinued, and he was placed on two wait lists for therapy.

On January 1, 2021, the mother and Mateo had a supervised telephone call.  After this, the mother reached out several times for additional contact with Mateo, but he did not wish to

7

speak to her. In March 2021, the mother, angry and intoxicated, told the DCF ongoing worker that she knew where Mateo lived and went to school, and she was going to kidnap him. The mother did not participate in a foster care review in March 2021 or a court investigation that was completed in September 2021. Throughout 2021, the mother regularly requested contact with Mateo, but he refused contact with her. The mother believed that someone was influencing Mateo to reject her, and that he would be "happier" with her because she was his biological mother.

Meanwhile, Mateo settled into life with his preadoptive family. He began calling his preadoptive parents "mom" and "dad." He formed a bond with his foster brother, with whom he shares a room. He is eager to be adopted into that family.[6] He started signing his name with their surname. In school, Mateo has an individualized education plan that addresses both his academic and emotional needs, and his grades improved substantially. He meets with the school adjustment counselor; receives support from the school psychologist; and meets weekly with his school therapist, whom he can also contact for support as needed during the school day. At the time of trial, Mateo was still on the wait list for a private therapist.

---

[6] Because Mateo is over twelve years old, his consent is required to adoption. See G. L. c. 210, § 2 (written consent of child required "if above the age of twelve").

8

Trial began on August 17, 2021, and was conducted via the Internet-based video conferencing platform Zoom. As of that point, the mother was not engaged with DCF and was unavailable for visits. She told the judge that she was then at the Salvation Army program in New Hampshire, but refused to disclose its name or address because it was a domestic violence shelter. On at least four occasions between May 2021 and the fifth day of trial, October 18, 2021, the judge warned the mother that she had outstanding warrants and repeatedly ordered her to clear them up. In October 2021, the mother canceled a scheduled visit with Mateo. On October 26, 2021, the mother was arrested on her outstanding warrants. In November 2021, the mother was the victim of domestic violence in Manchester, New Hampshire, but at trial refused to give any details about what happened.

The mother's trial testimony began on December 1, 2021. She testified that in November 2021 she had begun attending four AA meetings a week, seeing a psychiatrist, and attending substance abuse treatment three days a week. However, she refused to provide any documentation of those services or sign releases permitting DCF to confirm her participation. The judge credited the mother's testimony that in November 2021 she began reengaging in psychiatric services and substance abuse treatment. Asked where she was then living, the mother became extremely upset on multiple occasions, eventually testifying

9

that she was living temporarily with her grandmother in Lynn. Asked where she was working, the mother refused to answer. The judge found that the mother "presented at trial as unstable, angry, and impulsive with limited insight." The judge found that, despite engaging in a wide array of services since at least 1998, the mother "has been unable to make any meaningful changes, and continues to display poor insight."

After fourteen nonconsecutive days of trial between August 17, 2021, and April 12, 2022, the judge found that DCF had made reasonable efforts to restore Mateo to the mother's care. The judge concluded that the mother was unfit to care for Mateo and that termination of the mother's parental rights was in Mateo's best interests, and issued a decree terminating the mother's parental rights. The judge declined to order posttermination visitation but ordered that the mother may send one letter and one picture per year to the preadoptive parents. The judge subsequently issued detailed findings of fact and conclusions of law, "demonstrating, as we require, that close attention was given to the evidence." Adoption of Don, 435 Mass. 158, 165 (2001). The mother appealed.

Discussion. Unfitness. The mother argues that the judge acted prematurely in determining that she was unfit to parent Mateo, and that the mother "made a powerful case that there was a real likelihood that she was on a trajectory that soon would

10

enable her to be able to care for the child."  As evidence of that trajectory, the mother points to her testimony that she had cleared up her warrants and was attending AA meetings, psychiatric appointments, and therapy appointments.

"To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests" (citation omitted).  Adoption of Yalena, 100 Mass. App. Ct. 542, 549 (2021).  Because termination of parental rights is an "extreme step, . . . it is appropriate for a judge to consider whether, on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary" (citation omitted).  Care & Protection of Zeb, 489 Mass. 783, 788 (2022).  "Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period."  Id., quoting Adoption of Ilona, 459 Mass. 53, 60 (2011).

As set forth above, the judge had before her ample evidence on which to base her finding that the mother was unfit to parent Mateo, and that her unfitness as a parent was likely to continue.  The mother conceded at trial that she was not ready

11

to have custody of Mateo.  The judge noted that the mother had not had custody of Mateo since he was six years old, had not seen him in person since the fall of 2019, and had not spoken to him since January 2021.  The mother was "on the run" from DCF for two years of Mateo's life, while he was nine to eleven years old and living in a group home, then in a foster home, and finally with his preadoptive family.

At the same time, the judge recognized that the mother had made some progress, and encouraged her to continue with treatment.  The judge specifically found that the mother loves Mateo.  A finding of unfitness is not a determination that the mother does not love Mateo.  See Adoption of Darlene, 99 Mass. App. Ct. 696, 702 (2021).

The judge's analysis shows that she based her custody determination on an "'even handed' assessment of the evidence." Adoption of Helga, 97 Mass. App. Ct. 521, 528 (2020), quoting Adoption of Hugo, 428 Mass. 219, 225-226 & n.8 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999). "[O]ur lodestar is necessarily the best interests of the child." Adoption of Bea, 97 Mass. App. Ct. 416, 417 (2020).  "[W]e defer to the judge's determinations regarding the best interests of the child, and reverse only where there is a clear error of law or abuse of discretion" (citation and quotation omitted). Adoption of Helga, supra.  "At some point the court must say,

'Enough,' . . . and act in the child[]'s best interests"
(citation omitted).  Adoption of Ilona, 459 Mass. at 60.  See
Adoption of Lisette, 93 Mass. App. Ct. 284, 297 (2018).

Reasonable efforts.  The mother argues that the judge
abused her discretion in finding that DCF made reasonable
efforts to restore Mateo to the mother's care as required by
G. L. c. 119, § 29C.

During trial, the mother filed a written objection to any
finding that DCF had made reasonable efforts, arguing, as she
argues here, that Mateo had not been receiving sufficient
therapeutic services in his preadoptive home.  The judge found
that DCF had made reasonable efforts, though she acknowledged
that Mateo "should have been in therapy" while in the
preadoptive home.  We agree that the delay in finding a
therapist for Mateo did not negate the mother's inability to
meet his needs.

In arguing that DCF did not make reasonable efforts to
restore Mateo to her care, the mother also raises claims that
DCF failed to provide her with services or to ensure that she
took advantage of them.  Both DCF and Mateo argue that the
mother did not raise those claims below, and so she waived them.
See Adoption of West, 97 Mass. App. Ct. 238, 242 (2020).  We
tend to agree, but even if we were to consider the claims, they
would not undermine the judge's finding that DCF's efforts were

13

reasonable.  As to the mother's claims that DCF should have followed through on recommendations made in 2018 that she obtain services, and should have granted her more visitation with Mateo, the mother's own conduct in going "on the run" and hiding from DCF for two years severely undermines her attempt to cast blame on DCF.  DCF's "obligation to make reasonable efforts to reunify the child with the mother is contingent upon her obligation to substantially fulfill her parental responsibilities (including seeking and using appropriate services)."  Adoption of Yalena, 100 Mass. App. Ct. at 554.  See Adoption of Daisy, 77 Mass. App. Ct. 768, 782 (2010).  Contrast Care & Protection of Walt, 478 Mass. 212, 217 (2017) (no reasonable efforts, where DCF investigator testified she did not know what services were available and it was "not her job" to prevent removal from home).

We are mindful that the mother's past unfitness to parent Mateo and the likelihood that her unfitness will continue indefinitely are in part the result of the disease of addiction. However, the mother's arguments that DCF's efforts fell short of reasonable because of a lack of evidence that DCF ensured that Mateo understood the disease of addiction or cleared up his "confusion" about his mother's lack of communication while she was on the run, even if raised below, would not be grounds to set aside the judge's finding that DCF made reasonable efforts.

14

Posttermination visits.  The mother argues that in declining to mandate posttermination visitation between her and Mateo, the judge did not sufficiently consider the best interests of the child and gave too much weight to her finding that there was not a "particularly strong bond" between the mother and Mateo.  We are not persuaded.

Based on the evidence before her, the judge had ample grounds to decline to require posttermination visitation.  In particular, the judge credited the testimony of the preadoptive mother that if in the future Mateo expressed a desire for contact with the mother, the preadoptive parents would cultivate it.  "There is no reason to question the presumption that [Mateo]'s preadoptive parents will act in [his] best interest in evaluating -- now and in the future -- whether continued contact with [his] mother is in [his] best interest . . . ; nor is there any compelling reason requiring that a visitation order be

15

entered in order to protect the best interests of the child"
(citations omitted).  <u>Adoption of Ilona</u>, 459 Mass. at 66.

    <u>Conclusion</u>.  Accordingly, the decree terminating the
mother's parental rights to Mateo is affirmed.

<u>So ordered</u>.

By the Court (Massing,
  Henry & Grant, JJ.[7]),

*Joseph F. Stanton*

Clerk

Entered:  September 27, 2023.

---

[7] The panelists are listed in order of seniority.

16