NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-645

ADOPTION OF REMIAH.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother and the father appeal from decrees entered in the Juvenile Court, terminating their parental rights as to their daughter, Remiah (child). On appeal, both parents argue that the judge failed to apply the correct legal standard to determine the parents' unfitness. The mother also asserts that the judge erred in (1) considering findings of fact from a prior care and protection matter involving the mother's older children, (2) finding her unfit, and (3) leaving to the discretion of the child's legal custodians the question of any posttermination and postadoption visitation between the mother and the child in addition to one visit per year. Additionally, the father argues that the judge erred in (1) considering his juvenile record, (2) finding he had not meaningfully engaged in his action plan tasks and finding him unfit, and (3) failing to

_____

[1] A pseudonym.

make findings regarding the best interest of the child.  After careful review of the record and consideration of the judge's findings, we affirm.

Background.  We summarize briefly the findings of fact entered by the judge, which must stand absent clear error.  The child, born in May 2020, is the mother's third child and the first with the father.  The mother has previously been involved in care and protection proceedings that resulted in the termination of her parental rights with respect to her two older children.

Shortly after losing custody of her older children in 2019, the mother began a relationship with the father and moved into an apartment owned by his parents.  The father, then sixteen years old, was committed to the Department of Youth Services until he turned eighteen but lived in his parents' home across the street from the mother's apartment.[2]

The Department of Children and Families (department) became involved with the child in May 2020, when the child was born premature and substance exposed to marijuana.  The department received a G. L. c. 119, § 51A report (51A report) of neglect of the child, and the mother tested positive for marijuana at the

---

[2] The father turned eighteen in June 2020, approximately a month after the child was born.

2

hospital.  The hospital discharged the child to the father and paternal grandparents.

In May or June 2020, the mother was hospitalized for alcohol poisoning.  The mother was combative, and police had to hold her down so medical personnel could sedate her on the way to the hospital.  In June 2020, the mother attacked hospital staff.  Police were called and, again, assisted medical personnel in sedating the mother.

The mother and the father continued their relationship and continued to live across the street from one another, with the father spending some nights at the mother's apartment.  The paternal grandparents provided child care when the father worked and supervised the mother's twice daily visits with the child.

The mother's relationship with the father included significant incidents of domestic violence, beginning after the child's birth and continuing to three months before trial.  The mother called the police repeatedly, resulting in six police responses between October 2020 and September 2021.  On two occasions in the fall of 2020, police found the mother with injuries, including to her hand, knee, and face, some of which she attributed to the father.  In November 2020, the department received a 51A report alleging parental neglect of the child. The report included medical records showing that the mother received a series of injuries resulting from domestic violence,

3

resulting in stitches in October 2020 and an orbital fracture in November 2020.

In response to this report, the department removed the child from the father's home. The mother initially told hospital staff that the father had caused the orbital fracture but subsequently told them that it had been his sister. When asked by the department, both parents denied any physical violence but admitted verbally arguing. The mother denied that the father or his sister had ever hit her and denied making any such statement to medical staff.

The 911 calls and police responses continued after the removal of the child. In December 2020, the mother called 911 due to an argument with the father. In May 2021, the mother called the police after an argument with the father, reporting that the father's family chased her down the street, and that she defended herself with a taser. In November 2021, police received an abandoned 911 call from the mother, who subsequently insisted that it was an accidental dial and that she did not need service. In December 2021, police responded to a call from the maternal grandmother, stating that she received a text message from the mother that the father had hit her face. Responding to the call, police observed a small red mark on the left side of her face. The father told police that the mother had started the fight and that she had injured his mouth.

4

Later that day, the mother obtained an abuse prevention order. In her affidavit, the mother stated that the father had shown up at the apartment drunk, called her names, and demanded that she leave, and when she refused, he threatened to get his sister to beat her up. She further claimed that earlier that month, the father had woken her up, verbally abused her, and threated her; he also threatened to have his sister beat her up and to beat up the mother's brother. Additionally, she wrote in her affidavit that the father had previously smacked her across the face, choked her, and "threatened her with his mother, father, and sister," who, the mother again claimed, had caused her orbital fracture.

Discussion. 1. Legal standard. When making a determination of a parent's unfitness, "subsidiary findings of fact must be supported by a preponderance of the evidence, with the ultimate determination of unfitness based upon clear and convincing evidence." Adoption of Rhona, 63 Mass. App. Ct. 117, 124 (2005). The mother and father both cite conclusion of law no. 2 in contending that the judge erroneously applied the preponderance standard to conclude that the mother and father were unfit. Though the mother and father correctly observe that the judge's conclusion expressed the parents' unfitness by

5

reference to the preponderance of the evidence,[3] in context, we understand the reference instead to reiterate that the subsidiary findings of fact were adequately supported by a preponderance of the evidence.[4]  The remaining conclusions of law contain numerous correct articulations and applications of the appropriate legal standards and clearly establish that the judge's ultimate determination of the parents' unfitness was based upon clear and convincing evidence.  Read in context, we agree with the department that, to the extent the reference in conclusion of law no. 2 may be read to recite the wrong standard for the finding of unfitness, it is properly understood as a scrivener's error.

2.  <u>Termination of the mother's parental rights</u>.  a. <u>Prior care and protection matter</u>.  Generally, recent findings from a

---

[3] The judge stated, "It has been proven by at <u>least a fair preponderance of evidence</u> that each parent, individually and as coparents, is unfit to care for the child and that their unfitness is extremely likely to continue into the indefinite future" (emphasis added).

[4] The judge introduced her conclusion by stating the correct legal standard:

"In a care and protection proceeding, subsidiary factual findings need only be proved by a fair preponderance of the evidence, rather than by clear and convincing evidence. 'Taken together, these facts must then prove parental unfitness, since it is the "critical inquiry," by clear and convincing evidence.' <u>Care and Protection of Laura</u>, 414 Mass. 788, 793 (1993)."

prior care and protection decision are admissible in a later proceeding "when such findings are relevant and material and made during a proceeding in which the parent[] had a compelling incentive to litigate." Adoption of Darla, 56 Mass. App. Ct. 519, 520-521 (2002). The findings in this case regarding the mother's recent history of unstable mental health and substance abuse are relevant and material, and the mother had a prior opportunity and compelling incentive to litigate these issues.[5]

This case is distinguishable from Care & Protection of Zita, 455 Mass. 272 (2009). There, a judge improperly relied on an unsworn petition and facts the judge learned presiding over earlier cases involving the mother, neither of which were in evidence. Id. at 279-282. Here, the judge properly admitted into evidence the findings of another judge in a prior proceeding terminating the mother's parental rights to her older children.[6] Admission of the findings was not error.

b. Nexus to unfitness. The mother does not dispute the judge's subsidiary findings regarding her mental health and

---

[5] Indeed, the mother fully litigated these issues. See Adoption of Zaria, 103 Mass. App. Ct. 1116 (2023) (affirming termination of mother's parental rights to her older children).

[6] The judge considered only so much of the prior findings as they related to the mother's prior interaction and progress with the department and primarily relied on the facts dating from the time the mother became pregnant with the child.

7

substance abuse problems but argues that there was no significant nexus between them and her parenting ability. Therefore, she argues, the judge abused her discretion when she relied on these factors to ultimately find the mother unfit and terminate her parental rights.  We disagree.

Substance abuse during and after pregnancy cannot be the sole ground for terminating parental rights without evidence that the parent "provide[d] less than minimally acceptable care" for the child.  Adoption of Katharine, 42 Mass. App. Ct. 25, 31 (1997).  See id. at 34 ("we do not think a cocaine habit, without more, translates automatically into legal unfitness" [emphasis added]).  However, the mother's substance abuse was not viewed in isolation.  The judge relied on it, in conjunction with domestic violence, mental health challenges, and inappropriate housing, to support her overall finding of unfitness.  The judge properly considered the mother's substance abuse along with the other factors contributing to the mother's inability to care for the child.

Mental disorders are "relevant only to the extent that [they] affect[] the parents' capacity to assume parental responsibility."  Adoption of Frederick, 405 Mass. 1, 9 (1989).  A parent's "unwillingness to adhere to [the department's] service plan, which required her to obtain treatment for her mental health challenges and substance use disorder, is relevant

8

to the determination of unfitness" (quotation and citation omitted). Adoption of Luc, 484 Mass. 139, 147 (2020). While the mother sporadically attended therapy from June 2021 to September 2021, she failed to complete an anger management program, a longstanding part of her action plans during both care and protection cases.

The trial judge did not abuse her discretion when she terminated the mother's parental rights. An abuse of discretion occurs when a judge makes "a clear error of judgment in weighing the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives" (quotation and citation omitted). L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014). Considering the robust evidence of the mother's substance abuse and mental health concerns, the trial judge did not err when she weighed these factors to find the mother unfit.[7] Further, the trial judge did not rely solely on these factors. She properly considered the mother's history of domestic abuse, inappropriate housing, and refusal to

---

[7] "Despite the moral overtones of the statutory term 'unfit,' the judge's decision was not a moral judgment or a determination that the mother and father do not love the child." Adoption of Bianca, 91 Mass. App. Ct. 428, 432 n.8 (2017). Indeed, the judge specifically found that both parents demonstrated love for the child.

cooperate with the department's action plans.  We find no error in judgment in her careful analysis of these relevant factors.

c.  Inappropriate housing.  Evidence of a parent's failure to maintain adequate housing and "keep a stable home environment" is relevant to the unfitness determination. Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 399 Mass. 279, 289 (1987).  See Adoption of Anton, 72 Mass. App. Ct. 667, 676 (2008).  Moreover, "it is proper for a judge to consider a parent's living arrangements at the time of trial despite the fact that the child was not living with her at that time."  Adoption of Virgil, 93 Mass. App. Ct. 298, 303 (2018).

The record supports the judge's determination that the mother failed to establish appropriate housing.  While it is true that the mother lived in the same apartment for three years before the trial,[8] the length of her tenure was not the source of the judge's concern.  Despite the history of violence between the mother and the father and his family, the mother continued to live across the street from the father in an apartment owned by his family.  She did not have a lease and paid rent to the

_____

[8] The mother briefly left this apartment for one month in 2021 when she lived with her great uncle.  However, she subsequently returned to the apartment owned by the father's parents.

10

father's parents irregularly.  The apartment was unclean and in poor condition, and home visits found a missing stair railing, excessive trash, minimal food, and a large hole in the ceiling from a burst pipe.  During the department's last home visit, in March 2022, the mother refused to allow the worker to go upstairs to view the bedrooms and did not grant subsequent home visits despite the department's requests.

d.  Posttermination and postadoption contact.  The power to order posttermination and postadoption contact rests within the discretion of the trial judge, who may determine the extent to which decisions regarding visitation are left to the judgment of the adoptive family.  See Adoption of Rico, 453 Mass. 749, 754 (2009).  An order of postadoption contact should be "carefully and narrowly crafted to address the circumstances giving rise to the best interests of the child."  Adoption of Vito, 431 Mass. 550, 564 (2000).  The judge must also weigh any "intrusion that an order imposes on the rights of the adoptive parents, who are entitled to the presumption that they will act in their child's best interest."  Adoption of Ilona, 459 Mass. 53, 64-65 (2011).  Considering these relevant factors, we find that the trial judge did not abuse her discretion in ordering visitation with the child only once per year.

Although the child was removed from the mother's custody as an infant, the trial judge concluded that the child "enjoys

visits" with her parents and half-siblings and that she "reciprocates affection," though she "does not demonstrate a bond beyond a comfortable familiarity with each parent." In any event, even where a significant bond exists between parent and child, providing a basis for postadoptive visitation, such an order is not automatic, and is warranted only where it is in the best interests of the child. See Adoption of Ilona, 459 Mass. at 63-64. And an order for a specific minimum number of visits merely sets a floor, leaving to the adoptive parents the possibility of additional visits if they would be in the best interests of the child. See Adoption of Zander, 83 Mass. App. Ct. 363, 366 (2013). We discern no abuse of discretion in the order requiring one visit per year.

3. Termination of the father's parental rights. Termination of parental rights requires "a two-part analysis." Adoption of Nancy, 443 Mass. 512, 515 (2005). "First, the judge must find that the parent is presently unfit." Adoption of Cadence, 81 Mass. App. Ct. 162, 167 (2012). "Second, the judge must find that 'it would be in the child's best interests to end all legal relations between parent and child.'" Id., quoting Adoption of Nancy, supra.

a. The father's unfitness. "Violence within a family is highly relevant to a judge's determination of parental unfitness and the best interests of the children." Adoption of Gillian,

12

63 Mass. App. Ct. 398, 404 n.6 (2005). Nor is harm limited to cases where the child directly witnesses domestic violence. Adoption of Lisette, 93 Mass. App. Ct. 284, 294 n.15 (2018) ("A parent's willingness to ignore or minimize abusive behavior can be an indicator of unfitness, regardless of whether the child is at risk of abuse or witnessing abuse").

The judge concluded that the father "continues to deny the domestic violence between himself and [the m]other, which is clearly evidenced in other credible portions of the record," and "has not sufficiently engaged in domestic violence education or treatment as a batterer and does not have any insight as to what domestic violence is." These findings are supported by police reports and medical records showing signs of the mother's abuse. Though the father presented a different account at trial, the judge did not find him credible. See Adoption of Nancy, 443 Mass. at 515 (noting trial judge has "discretion to evaluate a witness's credibility and to weigh the evidence").

Additionally, the father failed to adequately engage with the department, allowing the judge to conclude that the father was not progressing toward becoming fit. Although the department scheduled monthly visits for the father in July, August, and September of 2021, he either failed to attend or canceled each one. The father refused to allow a social worker into his home during a visit in December 2021. Despite being

13

part of his action plan from the beginning, the father only began anger management classes near the start of the trial. We find no error in the judge's determination of unfitness.

b. The father's juvenile record. The judge did not err by referencing the father's juvenile record.[9] The father's counsel did not object to the admission of the police records documenting the father's delinquency history. Any objection is therefore waived, and the judge was permitted to consider the "full probative force" of the evidence (citation omitted). Adoption of Kimberly, 414 Mass. 526, 534-535 (1993) (failure to object to proffered evidence at trial results in waiver of objection).[10]

c. Best interest of the child. The trial judge made detailed findings about the fitness of the child's parents, the child's needs, and the suitability of the child's adoptive home.

---

[9] The judge's findings made only passing references to the father's juvenile record. Even if the admission of the father's juvenile record was erroneous, any error would be harmless as those findings were "not central to the ultimate conclusion of unfitness." Care & Protection of Olga, 57 Mass. App. Ct. 821, 825 (2003).

[10] To the extent that the father also argues that the judge erred by finding that he had a significant criminal "record" as an adult, as the judge found, an abuse prevention order issued against the father three months before trial, and there were "multiple police responses throughout the pendency of the case." In determining parental fitness, the judge was entitled to consider the father's criminal conduct and history, even though it did not lead to an arrest or conviction. See Care & Protection of Frank, 409 Mass. 492, 496-497 (1991).

14

The evidence demonstrated that the mother and the father struggled with substance abuse, and there were frequent police visits as well as significant evidence of domestic violence perpetrated by the father. Furthermore, the trial court found that the child was "thriving" in her preadoptive home and was "healthy and developmentally on target," had formed a strong bond with her foster parents, and was in a "loving, secure, nurturing home."

"In determining the best interests of the child, the judge must consider, among other things, 'the plan proposed by the department.'" Adoption of Varik, 95 Mass. App. Ct. 762, 770 (2019), quoting G. L. c. 210, § 3 (c). A placement plan does not need to be "'fully developed' in order to support a termination order, but it must provide 'sufficient information about the prospective adoptive placement "so that the judge may properly evaluate the suitability of the department's proposal."'" Adoption of Varik, supra, quoting Adoption of Willow, 433 Mass. 636, 652 (2001). "In determining the sufficiency of the plan, the judge may consider evidence and testimony presented at trial regarding unfitness and the child's best interests, in addition to the written plan." Adoption of Varik, supra, citing Adoption of Willow, supra at 653.

In October 2021, the department filed a report under G. L. c. 119, § 29B (29B plan), stating that the child was in a

15

preadoptive placement with the permanency goal of adoption.  On November 2, 2021, the judge approved the child's placement through adoption in accordance with the 29B plan.  The mother filed an objection to the permanency plan, but the father did not.  Additionally, a department social worker testified at length about the child's placement and the adoption plan.  Accordingly, the trial court's determination that termination was in the child's best interests with consideration of the adoption plan was not an abuse of discretion.

Conclusion.  The judge did not err in admitting the findings from the prior care and protection proceedings and the police records documenting the father's juvenile delinquency history into evidence.  Moreover, she properly considered evidence of domestic violence in the father's relationship with the mother, the mother's substance abuse and mental health concerns, and both parents' inconsistent engagement with services.  We conclude that the judge did not abuse her discretion in finding the parents unfit or in concluding the

16

termination of the parents' parental rights to be in the best interests of the child.

Decrees affirmed.

By the Court (Green, C.J., Desmond & Hershfang, JJ.[11]),

Assistant Clerk

Entered:  June 17, 2024.

---

[11] The panelists are listed in order of seniority.