NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1078

ADOPTION OF ISHA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The parents of Isha, who was born on December 30, 2020, appeal from decrees issued by a judge of the Juvenile Court terminating their parental rights, dispensing with their consent to adoption, and declining to order postadoption visitation. Isha joins her parents in appealing from the decrees.  In addition to claiming that termination of parental rights was not in Isha's best interests, the mother and Isha argue that several of the judge's findings of fact are clearly erroneous, that termination of the mother's parental rights was not properly before the court, and that the judge erred in not ordering postadoption visitation.  Both parents assert that the Department of Children and Families (department) failed to make

_____

[1] A pseudonym.

reasonable efforts to reunify the family, and that the department's adoption plan was inadequate because a home study of the preadoptive parents had not been completed by the time of trial. Lastly, the parents claim that the judge exhibited bias against them by requesting that the department introduce several abuse prevention orders obtained by the mother against the father, and then depriving them of their right to due process by relying on that evidence in reaching her conclusions. For the reasons we discuss in more detail below, we conclude that the judge did not abuse her discretion and acted properly in all respects. We therefore affirm the decrees.

Background. Following a trial at which the mother, father, and two department social workers testified, the judge issued extensive findings of fact and conclusions of law. We summarize the relevant facts, reserving certain details for our discussion. The mother struggled for years with substance misuse and addiction prior to Isha's birth. That struggle contributed to her losing custody of her three older children. During her pregnancy with Isha, the mother used illicit drugs and was the victim of domestic violence perpetrated by the father. Several days before Isha's birth, the mother alleged that the father struck her with a firearm, and she obtained a restraining order. When Isha was born, she tested positive for

2

fentanyl and marijuana, and the department took emergency custody of her at the hospital.

Thereafter, on January 4, 2021, the department filed a petition pursuant to G. L. c. 119, § 2, alleging that Isha was in need of care and protection. The mother and father waived their rights to a temporary custody hearing, and the department was awarded temporary custody. The department then placed Isha with her mother at Angel House, a family shelter for homeless women recovering from drug and alcohol addiction. The two lived there for approximately seven months. During that time, the mother engaged in several therapeutic programs and made progress toward maintaining sobriety. However, in August 2021, she tested positive for marijuana, which caused her to be terminated from the program. The mother was transferred to another residential program, Genesis II, but was forced to leave that program after again testing positive for marijuana in October 2021.

Meanwhile, in September 2021, the parents had agreed to a conditional custody arrangement whereby the mother had temporary custody as long as she remained at Genesis II, and the father had supervised visits. After leaving Genesis II with Isha, the mother moved into a motel with the father. This arrangement violated the conditions of the mother's custody of Isha, and, as a result, the department again obtained emergency custody of

3

Isha on November 15, 2021. Eventually, Isha was placed in the foster home where she was residing at the time of trial.

After Isha's second removal from the mother, the mother and father failed to make significant progress toward improving the conditions that had led to Isha's removal. There were continued concerns of domestic violence and substance misuse. These issues impacted the parents' relationship with Isha. For example, on one occasion in April 2022, the parents abruptly canceled a scheduled visit with her. It subsequently came to light that on that same visitation day the mother had contacted the police and reported that the father was being aggressive toward her and using substances.

Despite the department's concerns over missed visits, the parents' sobriety, and their unhealthy relationship with each other, the department worked with both parents to achieve the goal of reunification. At one point, the department attempted to facilitate the mother's placement with Isha in another residential program, conditioned on the mother demonstrating a commitment to complying with the program's requirements. Although that placement did not materialize, the mother was engaged in substance misuse treatment and claimed to have clean drug screens during this time. However, the mother did not make any substantial progress toward resolving her tumultuous relationship with the father. The department continued to

4

receive several reports of domestic violence, and department social workers periodically observed the mother with injuries. Although the mother consistently denied that she was the victim of domestic violence, she called the police to report that the father had assaulted her in June 2022, and she obtained a restraining order against him. The mother obtained another restraining order in September 2022 after alleging that the father had physically assaulted her. The father was charged with assault and battery and other criminal offenses in connection with these two incidents. The cases were open at the time of trial.

In July 2022, the department changed Isha's permanency goal to adoption. By this time, the mother's and father's rapport with the department had become antagonistic. On one occasion in September 2022, a department social worker visited the parents at the motel where they were staying and later reported that the parents would "lose their minds" when the social worker said something with which the parents disagree. When the social worker left, one of the parents shut the door on her, hitting her leg. Neither parent attended Isha's medical appointments even though, despite their claim to the contrary, they were informed of the appointments and invited to attend. When, on November 4, 2022, the department filed a notice of intent to seek termination of the mother's and father's parental rights,

the relationship between the parents and the department remained difficult.

At the time of trial, the mother was still residing with the father. Although the mother had reported incidents of domestic violence to the police and social workers, she denied any physical abuse when she testified at trial. For his part, the father did not accept any responsibility for his conduct, was terminated from an intimate partner abuse program, and blamed others for his history of domestic violence. The judge found that neither parent had developed any insight into their abusive relationship or had demonstrated how they would change their behavior to protect Isha in the future.

In addition, the judge found that neither parent understood how their substance misuse affected Isha. The mother began using alcohol and drugs at the age of thirteen. Although she had engaged in substance misuse treatment, sometimes successfully, she was twice discharged from residential programs due to her use of marijuana. The mother testified that she did not believe that the use of marijuana amounted to a lapse of sobriety. As the judge noted, the mother completed an outpatient treatment program in April 2022, but did not follow through with counselling or consistently attend Alcoholics Anonymous (AA) meetings thereafter. The father similarly had difficulty maintaining his sobriety. He testified

6

inconsistently at trial about his use of marijuana and alcohol and, although he claimed to have been sober for two years preceding the trial, the department was not able to confirm this assertion, and there was no evidence to support it other than the father's testimony.

Isha was almost eleven months old at the time she went to live with the foster parents. She was developmentally delayed and could not sit upright without assistance or hold a bottle by herself. The foster parents, who want to adopt Isha, obtained recommended services to address her complex medical needs. Isha has been diagnosed with microcephaly, global developmental delay, polymicrogyria (a brain malformation impacting motor skills), and mild cerebral palsy. By the time of trial, Isha had made significant progress. She could pull herself into a sitting position with assistance and, with the use of leg braces and an equipment trainer known as a Rifton Pacer, she could stand. Isha was receiving early intervention services, weekly physical therapy, and care from a neurologist and orthopedist.

The judge found that the foster parents have demonstrated a strong commitment to Isha. At the conclusion of the trial, Isha, who was then twenty-two months old, had been living with the foster parents (also referred to as her preadoptive parents) for thirteen months. The judge found that Isha will continue to need caretakers who can assist her with daily activities

7

including walking, eating, and speaking, and that Isha will need ongoing services to address possible seizures and vision problems in the future.  The judge also found that the preadoptive parents have shown their ability to meet Isha's current needs, and the judge concluded that they would continue to do so in the future.

Discussion.  The standard for termination of parental rights involves a two-step analysis.  A judge must determine first that a parent is unfit, and second that the termination is in the best interests of the child.  See Adoption of Nancy, 443 Mass. 512, 515 (2005).  We review the judge's decision to terminate parental rights for an abuse of discretion.  See Adoption of Hugo, 428 Mass. 219, 225 (1998), cert. denied sub nom. George P. v. Hugo P., 526 U.S. 1034 (1999).

Here, the judge properly concluded, based on clear and convincing evidence, that the mother was unfit to care for Isha, and that termination of the parents' rights was in Isha's best interests.[2]  The parents' history of domestic violence, coupled with their unaddressed substance misuse and lack of stability, amply support the judge's conclusion that neither parent was in a position to care for Isha at the time of trial nor would be able to do so in the future.  Moreover, contrary to the mother's

_____

[2] The father did not seek custody at trial.  Instead, he argued that custody should be given to the mother.

assertion, the judge considered positive evidence of her ability to parent Isha. The judge specifically noted the mother's progress, albeit intermittent, in achieving sobriety and completing multiple tasks set forth in the department's action plan. Ultimately, the judge concluded that these gains were not sufficient, and, in light of Isha's significant needs, neither parent could adequately care for their daughter. Based on our review of the record, the judge did not abuse her discretion in reaching this conclusion.

We now turn to the parents' and Isha's specific arguments.

1. Alleged erroneous facts. The mother and Isha challenge three of the judge's findings of facts as clearly erroneous. They claim that the record does not support the judge's finding that the mother had not consistently engaged in substance misuse treatment, the judge incorrectly suggested that the mother did not facilitate reentry into a residential program with Isha, and the judge erred when she found that the mother had been made aware of Isha's medical appointments.[3]

---

[3] Isha also argues that the judge's finding that she was not crawling as of October 2022 is clearly erroneous. We need not resolve this claim as there was ample evidence that Isha needed assistance to sit, stand, and eat at that time. Thus, even if we were to agree with Isha on this point, this minor discrepancy was not central to the ultimate issue of unfitness and, therefore, is immaterial. See Care & Protection of Olga, 57 Mass. App. Ct. 821, 824-825 (2003).

"A finding is clearly erroneous when there is no evidence to support it, or when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" (quotation and citation omitted). Custody of Eleanor, 414 Mass. 795, 799 (1993). Here, the challenged findings are either supported by the evidence or are immaterial errors.

First, there was ample evidence to support the judge's finding that the mother's commitment to substance misuse treatment was inconsistent. In particular, the mother was twice discharged from residential programs due to her marijuana use, and she did not regularly attend counselling or AA meetings. The judge did not ignore evidence that the mother had made some progress in achieving sobriety. In fact, the judge specifically noted that the mother had completed several substance misuse programs. The judge found, however, that despite this progress, the mother had failed to obtain regular, consistent treatment and had not benefited from the treatment and services she did receive.

Next, the mother argues that the judge clearly erred in faulting her for not enrolling in a third residential shelter after Isha was removed from her care the second time. This argument centers on the question whether the mother needed a reunification letter from the department, which the mother

10

claims she did not receive. Our review of the testimony reveals no error. In any event, assuming without deciding that the judge erred in finding that the mother rather than the department was at fault, this finding had little to no bearing on the judge's ultimate finding of unfitness, which was based on substantial evidence of noncompliance with treatment. See Care & Protection of Olga, 57 Mass. App. Ct. 821, 824-825 (2003).

Lastly, regarding the mother's knowledge of Isha's medical appointments, there was evidence that during a home visit in June 2022, a department social worker provided the mother with a list of Isha's upcoming medical appointments. The judge was entitled to credit the social worker's testimony and, therefore, despite the mother's and father's contrary testimony, this finding of fact was not clearly erroneous. See Custody of Eleanor, 414 Mass. at 799 ("the judge's assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference").

2. Alleged failure to make reasonable efforts to reunify family. Both parents contend that the department failed to make reasonable efforts toward reunification. To begin with, as the department argues in its brief, this issue is raised by the parties for the first time on appeal, and, therefore, it is waived. See Adoption of Yalena, 100 Mass. App. Ct. 542, 554

11

(2021).  However, even if preserved, this argument is unavailing.

It is well settled that "[b]efore seeking to terminate parental rights, the department must make 'reasonable efforts' aimed at restoring the child to the care of the natural parents."  Adoption of Ilona, 459 Mass. 53, 60 (2011), quoting Adoption of Lenore, 55 Mass. App. Ct. 275, 278 (2002).  "Reasonable efforts [are] generally understood to include accessible, available, and culturally appropriate services that are designed to improve the capacity of families to provide safe and stable homes for their children and to ensure that parents and other family members . . . are making progress on case plan goals" (quotations and citation omitted).  Care & Protection of Rashida, 488 Mass. 217, 219 (2021).

Here, both parents were offered a variety of services to improve their parenting skills, including treatment for domestic violence and substance misuse.  That the parents failed to take consistent advantage of these services is not a basis for concluding that the department did not fulfill its obligations.  See Adoption of Yalena, 100 Mass. App. Ct. at 554.

3.  Alleged premature termination of mother's parental rights.  The mother and Isha argue that the question whether to terminate the mother's parental rights was not properly before

12

the judge.  This argument was first raised by the mother and Isha in a motion to vacate the judgment, which was denied.

It is true that the trial, when initially scheduled, concerned the father's petition for review and redetermination pursuant to G. L. c. 119, § 26 (c).  The father filed the petition in April 2022, approximately five months after Isha was removed from the mother's custody a second time.  While that petition was pending, on November 4, 2022, the department filed a notice of intent to seek termination of the mother's and father's parental rights.  When the parties appeared in court for trial a few weeks later, counsel for the department stated: "As the Court and all parties are aware, we have filed a Notice of Intent, so we . . . also will be asking the Court to terminate rights today."  There was no objection, and during the subsequent trial the parties each addressed the question of the mother's unfitness and whether termination of the mother's rights was in Isha's best interests.

Given these circumstances, the motion to vacate the judgment on the ground that the question whether to terminate the mother's parental rights was not properly before the judge was correctly denied.  The mother had notice that the department was seeking termination of her parental rights at the beginning of the trial.  As noted, there was no objection.  Instead, the

13

mother proceeded to challenge the department's evidence and advocate for herself and Isha.

4. The department's plan for adoption. As previously noted, Isha was placed with the foster parents when she was eleven months old. Isha requires caretakers who will ensure that she receives specific services for her medical needs. The foster parents demonstrated that they are capable of taking care of Isha, have developed a strong relationship with her, and want to adopt her. Accordingly, the department recommended that Isha be adopted by the foster parents and referred the family for a preadoptive licensing study (PALS). At the time of trial, the PALS had not yet been completed. The judge nevertheless concluded that adoption by the foster parents was in Isha's best interests. The judge noted that the department's social worker, Isha's early intervention worker, and a day care provider all observed a positive and caring relationship between Isha and her foster parents. In addition, the foster parents had indicated their willingness to facilitate visits between Isha and the parents and paternal grandparents if the foster parents were permitted to adopt her. Although there were no other placement resources for Isha, she and both parents argue that the judge abused her discretion because the department's adoption plan had not been finalized.

14

It is well settled that before terminating parental rights, the judge must give "full and fair consideration to the department's adoption plan." Adoption of Helga, 97 Mass. App. Ct. 521, 529 (2020). However, "[t]he law does not require that the adoption plan be 'fully developed' in order to support a termination order, but it must provide 'sufficient information about the prospective adoptive placement so that the judge may properly evaluate the suitability of the department's proposal.'" Adoption of Varik, 95 Mass. App. Ct. 762, 770 (2019), quoting Adoption of Willow, 433 Mass. 636, 652 (2001). Here, in approving the department's recommendation that Isha be adopted by the current foster parents, the judge specifically found that the foster parents had demonstrated both the ability and commitment to care for Isha, and that Isha had developed a close bond with them. In view of these findings, which are supported by the record, we discern no abuse of discretion in the judge's approval of the department's adoption plan.

5. Postadoption visitation. The judge found that a significant relationship existed between Isha and her parents, and that continued contact with them was in Isha's best interests. She therefore ordered that both parents be offered a minimum of four visits with Isha per year until Isha was placed in a preadoptive home, or the PALS of the current foster parents was approved. The judge further ordered that once Isha was

15

adopted, the adoptive parents would have sole discretion in approving any additional contact between the parents and Isha. The mother argues that the judge abused her discretion by leaving postadoption visitation to the discretion of the adoptive parents. Isha makes the same argument and also contends that the judge abused her discretion by denying her motion for relief from judgment, which sought to clarify and ensure posttermination and postadoption visits.

In determining whether to order posttermination or postadoption visitation, a judge first determines whether visitation is in the child's best interests. See Adoption of Ilona, 459 Mass. at 63. The judge should consider the bond between the child and the parent whose rights have been terminated. In addition, where, as here, there is a family waiting to adopt the child, the judge must determine whether the child has a bond with the adoptive family. Where visitation is in the best interests of the child, the judge also must determine whether an order of visitation is warranted to protect the child's interest in maintaining a relationship with the biological parent. Id. at 64.

As noted, the judge found that Isha and the parents had a close bond. The judge also found that the foster parents have a close bond with Isha and had expressed their willingness to facilitate a relationship between Isha and the parents. Nothing

16

in the record provides a basis on which to conclude that the foster parents will act contrary to Isha's best interests in this regard. Given these circumstances, we discern no abuse of discretion in the judge's decision to leave future contact between Isha and the parents to the judgment of Isha's adoptive parents, or in the judge's denial of Isha's motion for relief from judgment.

6. <u>Alleged judicial bias and due process violations</u>. The mother and father assert that the judge erroneously admitted five abuse prevention orders in evidence, and that this error showed judicial bias, which undermined the proceedings and deprived the parents of due process. They further argue that the judge should have recused herself, and that the failure to do so requires that we vacate the decrees. The parents did not make any of these arguments at trial and, therefore, they are waived.[4] See <u>Palmer</u> v. <u>Murphy</u>, 42 Mass. App. Ct. 334, 338 (1997). Even if these claims had been preserved, they are unavailing.

We briefly recount the circumstances surrounding the admission of the orders. Before the last day of trial, the court clerk informed the parties that the judge intended to

---

[4] At trial, the parents objected to the admission of the orders solely on the ground that they were prejudicial and contained hearsay.

17

enter five abuse prevention orders obtained by the mother against the father in evidence. Before the trial resumed, counsel for the father requested clarification. The judge then explained that the orders in question would be marked as "court documents" and admitted in evidence. Id. The judge further informed all counsel that, should they wish to recall witnesses to make inquiries about the orders, they could do so. The orders were then marked as exhibits over the father's objection. Counsel for the father pursued the matter, asserting that recalling witnesses at this point would be "problematic," and arguing that that the orders contained prejudicial hearsay. The judge overruled the objection, noting that the Department of Probation had provided the orders to counsel at an earlier court proceeding, and that information about the abuse prevention orders was already in evidence.

Thereafter, the judge reversed course slightly and marked the exhibits for identification. She then asked if "any counsel is seeking to offer [the orders] into evidence." The attorney for the department requested that the orders be admitted, while counsel for the father and the mother objected. The objections were overruled, and the orders were entered in evidence. The judge offered counsel for all parties additional time if necessary, and she again noted that there was no prejudice to either the mother or the father because evidence of the

18

existence of the orders had already been introduced during the proceedings.

As an initial matter, we discern no prejudice where, as the judge noted, evidence of domestic violence and the existence of the abuse prevention orders had already been introduced at trial. Nor could there be any due process violations where there was no prejudice, and where the judge twice offered additional time to the parties to recall witnesses should they choose to do so.

Next, the judge's conduct did not reveal judicial bias. Our review of the record amply supports the conclusion that the judge treated the parties even-handedly throughout the proceedings, and that her decision to admit the orders did not stem from any bias against the parents. Moreover, as the department notes in its brief, the judge was obligated to consider evidence of domestic violence and determine whether such violence had a potential negative impact on Isha. See Custody of Vaughn, 422 Mass. 590, 599-600 (1996).

Lastly, there is nothing in the record to support a conclusion that the judge should have recused herself. The absence of a request for recusal is significant. See Adoption of Norbert, 83 Mass. App. Ct. 542, 547 (2013). The judge's conduct should not be called into question without sound reason, which does not exist here.

19

Conclusion. We affirm the decrees and the orders denying the motion to vacate the judgment and the motion for relief from judgment.

So ordered.

By the Court (Vuono, Neyman & D'Angelo, JJ.[5]),

*Paul Little*

Clerk

Entered: December 4, 2024.

---

[5] The panelists are listed in order of seniority.

20